310 So.2d 806 (1975)
James A. NOE
v.
Louis J. ROUSSEL, Individually and as Liquidator of Louisiana Citrus Lands, Inc., et al.
Nos. 55413 and 55418.
Supreme Court of Louisiana.
March 31, 1975.
Rehearings Denied April 25, 1975.
*808 Clifton S. Carl, Louis J. Roussel, III, Carl & Roussel, New Orleans, for defendant-applicant in No. 55413.
Hugh M. Wilkinson, Sr., Hugh M. Wilkinson, Jr., James Wilkinson, III, Wilkinson & Wilkinson, for plaintiff-respondent in 55413 and 55418.
Peter J. Butler, New Orleans, for defendant-respondent in No. 55,413.
Clem H. Sehrt, Peter J. Butler, Louis J. Roussel, III, Clifton S. Carl, Carl & Roussel, New Orleans, for defendant-applicant in 55418.
Jess R. Nelson, New Orleans, Edmund M. Reggie, Reggie Harrington & Boswell, Edwards, Stefanski & Barousse, Crowley, Broussard, Broussard & Moresi, Ltd., Abbeville, Claude B. Duval, Stanwood R. Duval, Jr., Duval, Arceneaux, Lewis & Funderburk, Houma, Sidney D. Fazio, McCollister, Belcher, McCleary & Fazio, Baton Rouge, for amicus curiae.
LANDRY, Justice Ad Hoc.
Plaintiff, Noe (Respondent), owner of a 20.8687% interest in Louisiana Citrus Lands, Inc. (Citrus), a Louisiana corporation, brings this action to rescind a sale of a 15,000 acre tract of land belonging to Citrus, together with certain movables of the corporation situated in Plaquemines Parish. The sale was made by defendant, Roussel (Roussel), a non-stockowning officer, director of Citrus, and sole liquidator of the corporation. The sale was made to *809 American Benefit Life Insurance Company of Alabama, an Alabama corporation (American), owner of the remaining 79.1313% interest in Citrus. At the time of the disputed transfer, Roussel owned or controlled 99% of American's stock. American is also made defendant herein. Pleading bad faith and fraud on Roussel's part, Noe asks rescission of the sale, and alternatively prays for damages against Roussel and American in solido. Henceforth Roussel and American shall be collectively referred to herein as "Relators". The trial court rejected Noe's demands in toto. The Court of Appeal, Fourth Circuit, reversed the trial court, rejected a plea of mootness filed therein by Relators, and ordered rescission of the sale upon finding that an inadequate price was paid for the property. We reverse the judgments rendered below and award Noe damages against Relators on Noe's alternative plea.
Two primary issues are presented for review. The first is Noe's claim of bad faith and fraud on Roussel's part, which allegedly deprived Noe of substantial rights. Basically, Noe claims Roussel breached his fiduciary duty as Liquidator, and acted beyond the scope of his authority in transferring subject properties to American for an inadequate consideration in defraud of Noe's interest in Citrus' assets. Noe specifically charges that Roussel and American are indistinguishable by virtue of Roussel's sole ownership of American.
Secondly, we are concerned with a plea of mootness filed by Relators in the Court of Appeal. This plea, predicated on the alleged sale of subject lands to a third party was rejected by the Court of Appeal, and is reurged before us. These primary issues spawn innumerable questions which can be put in proper perspective only by consideration of events preceding and attending two prior actions brought by Noe against Relators.
The controversial sale was for the sum of $6,409,600.00, of which sum $400,000.00 was paid in cash, and the remaining $6,009,600.00 acquitted by 500,705 shares of American stock valued by American at approximately $12.10 per share.
Noe and Roussel were business associates. For some time prior to 1968, Roussel was in the process of accumulating a large tract of land situated on the right descending bank of the Mississippi River (River) approximately 15 miles below the City of New Orleans. In furtherance of this venture, Roussel incorporated Citrus in whose name the acquisitions were made. In June, 1968, Roussel sold Noe a considerable amount of Citrus stock, both common and preferred.
Without Noe's knowledge and consent, his stock was carried on Citrus' books in the name of P. B. Gordon, a Roussel employee. Eventually, citrus acquired nine plantations having a combined frontage of about 15 miles along the River. Commencing upstream and proceeding downriver, the plantations and their acreages are as follows: Laresite, 764 acres; Alliance, 2408 acres; St. Rosalie, 2065 acres; Myrtle Grove, 2060 acres; Wood Park, 290 acres; Deer Range, 1840 acres; Junior, 832 acres; Pointe Celeste, 1747 acres, and Woodland, 1753 acres. In addition, Citrus acquired the Wilkinson canal, a 1,000 foot wide facility running from the rear of Myrtle Grove, southerly a distance of about 7 miles to Bay Five, containing 710 acres. Citrus also acquired two finger like projections running southerly from the rear of Deer Range. The upper tract, known as the Deer Range Canal, contains a net of 54 acres, and the lower, designated as Hermitage Ridge, which leads southerly to Lake Hermitage, embraces 425 acres. Also included in Citrus' holdings is Lake Hermitage containing 789 acres.
The river frontage of the property is continuous save for an intervening ownership separating Wood Park into two tracts, the upper part of which contains about 200 acres, and the lower portion 100 acres. Because of the meandering of the River, *810 the property is situated on the south bank of the stream. A levee system fully protects the property from the River. The land is low, a large portion thereof being what can best be described as reclaimed marsh. At the River, the land varies in elevation from about five feet above sea level at its upper extremity on Laresite, to about two feet above sea level at Woodland on the lower end. The land slopes southward from the River to the rear of the various tracts where the lowest elevation is approximately three feet below sea level. The Laresite acreage extends from the River to the forty arpent line; Alliance and St. Rosalie, save for the lower part of St. Rosalie, extend to the 80 arpent line. Myrtle Grove runs to the forty arpent line. The remaining plantations extend to the forty arpent line or beyond. The Wilkinson Canal, Deer Range Canal and Hermitage Ridge tracts extend into marsh. Lake Hermitage is a shallow lake.
The property has good road access. Louisiana Highway 23, a paved highway, runs through the entire property and beyond to Pointe-a-la-Hache. Between subject tract and Pointe-a-la-Hache are situated industrial establishments of considerable magnitude. Highway 23 is four-laned to Myrtle Grove at which point it becomes two lanes. Extension of the four-laning farther downriver is imminent. The Highway varies in distance from the River levee from about two thousand feet on Alliance and the upper part of St. Rosalie to approximately two hundred feet at the boundary between Junior and Pointe Celeste Plantations. The entire tract is traversed by a railroad which runs downriver to industrial complexes below and which extends as far as Pointe-a-la-Hache. Virtually all of the River frontage has water depth sufficient to accommodate ocean going vessels and bank and batture suitable for the construction of wharves and piers. Utilities, including gas, water and electricity are available to the upper portion of the property with electricity being available to the whole tract. Construction of the proposed LP&L generating plant will make further electricity available.
Prior to Citrus' acquisition, the lands south of Highway 23 were, for all practical purposes, marshland subject to infrequent overflow, except for certain ridges including Hermitage Ridge. Roussel reclaimed this portion with a levee system approximately 15 miles long at the rear of the various plantations. To minimize cost, high ground and ridges were used as levees where feasible. Inside the levee, a canal system connects with a pumping station situated at the junction of Wilkinson Canal with the rear of Myrtle Grove. The levees, canals and pumping station are supplemented by a system of feeder canals and ditches which drain the area. The Wilkinson Canal pumping station drains what may be said to be slightly more than the upper half of the entire tract. The lower portion is drained by a similar system of levees, canals and ditches with a pumping station located at the rear of Pointe Celeste Plantation. The levees range in height from approximately four to seven feet above sea level. The land in the drained area is in the process of "drying out". The record shows that save for only small areas and occasional ponds, the drained area is free of standing water and ready for use. In the drained area, the land is from one to three feet above the level of the water in the canals. Some portions of the drained area are presently used for agricultural pursuits and cattle grazing.
On January 7, 1966, Citrus sold Mississippi River Grain Elevator (Elevator) a riverfront tract of 62.88 acres taken from the lower part of Alliance and the upper portion of St. Rosalie for the sum of $188,640.00, or $3,000.00 per acre. The major portion of this parcel is situated on Alliance and extends from the River to about half the distance to Highway 23. The remainder, a long narrow tract, extends from the river to the highway and connects with another tract purchased by Elevator and situated on the south side of *811 the highway. On February 26, 1966, Citrus sold Elevator a 22 acre tract on the south side of the highway and a 20 acre tract above and adjoining the 62 acres previously purchased. This conveyance, for the sum of $103,650.00, indicated a per acre price of $2,472.00.
On May 18, 1969, Citrus granted Gulf Oil Corporation (Gulf) a surface lease of 668 acres covering the remaining river frontage of Alliance. The lease, for a primary period of 99 years, stipulates an annual rental of $200.00 per acre per year for the first 33 years; $232.00 per acre per year for the second 33 years; and $269.00 per acre per year for the last 33 years. An option to renew for an additional 99 year term is granted at the following per acre per year rentals for 33 year periods: $312.00, $362.00 and $420.00. Capitalized by Noe's experts, this lease indicated a $3,160.00 per acre value for the land. The lease also included that portion of Alliance lying to the south or rear of the Elevator property and extending to the highway.
Prior to July, 1970, Roussel commenced negotiation with Louisiana Power and Light Company (LP&L) for a location for a proposed large atomic powered generating plant to produce electricity for the City of New Orleans and the industrial complex which was developing in the area, including the development of Citrus' holdings. Agreement was reached as to the site for LP&L. Roussel realized that if the transaction matured, Federal Income Tax in the sum of approximately $1.5 million would be incurred due to the fact that Citrus' acquisition cost was nominal. To avoid this tax liability, Roussel decided to liquidate Citrus pursuant to Section 337 of the Internal Revenue Code which exempts from Federal taxation corporate profits on a liquidator's sale provided liquidation is completed within a year of commencement.
On June 13, 1968, Noe purchased from a New Orleans stockbroker 1979.5 shares of preferred and 298.43125 shares Class B Citrus shares then standing in the name of Canal Assets, Inc. The purchase price of $950,000 was paid from the proceeds of a loan to Noe in said amount by a Roussel controlled bank. Also, on June 13, 1968, American, through its President, Roussel, and Roussel, individually, agreed in writing to purchase Noe's stock within 90 days for the amount paid by Noe plus whatever interest had accrued on Noe's note. It is conceded that Noe requested this arrangement in the event of his inability to discharge the note if the instrument was transferred to a party who demanded payment. Noe paid the interest on the note until January 26, 1971, when he liquidated the obligation. It was Noe's understanding the note would be held by the creditor bank as security for Noe's loan. The note was never pledged.
On October 14, 1968, in an unrelated bankruptcy proceeding, Roussel was called upon to testify concerning ownership of what was then the Canal Assets, Inc. block of Citrus stock. In that proceeding, Roussel testified that Noe was owner of the Canal Assets, Inc. block in Citrus, and that the stock was in Noe's name on Citrus' books. On October 15, 1968, the Canal Assets, Inc. stock was transferred on Citrus' books to P. B. Gordon, Roussel's employee.
Roussel maintains he and Noe agreed that Noe would be a nominal owner with Roussel and/or American possessing the right to repurchase the stock at any time, and that Noe verbally agreed to transferring the shares to Gordon's name. Noe denies having discussed such a matter with Roussel, and also denies having received a letter from Gordon dated October 15, 1968, advising that the shares would be put in Gordon's name. Noe testified emphatically he would never have agreed to such an arrangement. Despite Roussel's claiming the right to reacquire Noe's stock at any time, Roussel made no attempt to do so until after liquidation of Citrus commenced.
On July 1, 1970, with Gordon and American being listed as sole owners of Citrus *812 stock, and with American being represented by Roussel, Citrus was placed in voluntary liquidation by a resolution of unanimous consent of said stockholders. Roussel was named liquidator without bond. The resolution granted the liquidator general authority to dispose of all corporate holdings, but did not specifically mandate a sale of all corporate assets and require that the proceeds be distributed as a liquidating dividend. The resolution also provided that after the sale to LP&L, the affairs of the corporation be wound up, and the remaining assets be distributed among the shareholders as a liquidating dividend. At this time, Roussel owned or controlled 99% of American shares. It is undisputed that at this time, Roussel intended to complete the LP&L sales, pay outstanding Citrus debts in the sum of $4,000,000.00, and distribute the remaining lands to the shareholders of Citrus as a liquidating dividend. It is also conceded that upon recognition of Noe's rights as a Citrus shareholder, Roussel changed his plans and decided to sell subject property at public auction.
On August 11, 1970, Roussel, as Liquidator, executed two options with LP&L. The first was for the sale of the remaining River frontage of St. Rosalie extending back to Highway 23, comprising 600 acres, together with a 29 acre tract fronting on the south side of the Highway about midway the 600 acre parcel. The stipulated price was $3,855,000.00. The other option was for a 400 foot right of way extending from the upper portion of Laresite downriver to the aforementioned 29 acre plot, containing about 149 acres. The price for the servitude was $345,000.00. These options, granted with Noe's approval, were exercised by LP&L in a letter to Roussel on January 29, 1971.
Noe filed suit February 3, 1971, asserting ownership of the Citrus shares he claimed, but which were registered in Gordon's name. Noe alleged Roussel's ownership, directly or indirectly, of all remaining Citrus stock, and also that Roussel was in the process of liquidating the corporation. As minority stockholder owning at least 25% of Citrus' shares, Noe invoked LSA-R.S. 12:142, subd. E, and prayed that the liquidation be ordered conducted under judicial supervision, and Roussel be required to post bond as liquidator.
The day after Noe filed suit, namely, on February 4, 1971, Roussel, as Liquidator, called Noe's preferred stock, and sent Noe a cashier's check in the sum of $393,920.50 in payment therefor. Noe accepted the money. After considerable legal maneuvering, including an intervention by American claiming ownership of Noe's shares, judgment was rendered on the merits of Noe's claim of stock ownership. The trial court declared Noe to be owner of not less than 25% of Citrus' stock, but declined to order judicial supervision of the liquidation. The trial court also dismissed the intervention by American. The judgment recognized Noe as owner of 20.8687% of Citrus' common stock, and that judgment has now become final.
Beginning in late 1970, and extending to March 25, 1971, on which date Noe filed the hereinafter discussed injunction suit, considerable communication was had between Noe, Noe's attorney and Roussel, individually, and as the alleged alter ego of American. It suffices to state that Roussel was put on notice that, as Liquidator, it was his obligation to safeguard Noe's rights as minority shareholder in Citrus. Roussel was further advised that any attempt on his part to transfer Citrus' assets to American, which Noe considered a wholly owned Roussel corporation, for an inadequate consideration, would be resisted by Noe to the ultimate. Noe also informed Roussel that Noe would oppose a liquidation sale of Citrus property for other corporate stock unless the stock given in exchange was readily tradeable at a fair market price.
A meeting of Citrus shareholders, including Noe as owner of a 20.8687% interest, was called by Roussel, as Liquidator, *813 for March 9, 1971. At the meeting, Roussel announced his intent to complete the LP&L sale, sell the remaining 15,000 acres at public auction to the highest bidder after advertisement three times within a thirty day period, pay Citrus' debts aggregating about $4,000,000.00, and distribute the remaining assets to the shareholders.
On March 25, 1971, Noe sought injunctive relief to prevent the sale which was then in process of advertisement. In that action, Noe claimed Roussel did not propose a bona fide sale of the acreage remaining after the sale to LP&L, but rather, through subterfuge, intended to acquire the property for Roussel's own account, at an inadequate consideration, to Noe's detriment and loss. Noe also contended a 30 day advertisement was inadequate for so vast a track of land, and that a sale of the land was not required to reap the tax advantage allowed by Section 337. Noe further alleged that, for purposes of Section 337, the remaining acreage could be distributed among the shareholders in kind as a liquidating dividend. Judgment was rendered April 13, 1971, rejecting Noe's application for injunctive relief. On April 23, 1971, Noe devolutively appealed, and on joint motion, the appeal was dismissed July 27, 1971.
The liquidation had to be completed by June 30, 1971. The dismissal of Noe's injunction suit having become final, Roussel advertised the sale in a Plaquemines Parish newspaper, the New Orleans Times Picayune and the Wall Street Journal, three times between March 15 and April 15, 1971. The ad appearing in the Plaquemines Parish paper was minutely small in type. The property was advertised as 15,000 acres of industrial and grazing lands and described in very general terms. Sealed bids were called for, to be submitted to Roussel as Liquidator, not later than 5:00 P.M., April 15, 1971. The sole bid, submitted by American, offered $400,000.00 cash and 500,705 shares of American stock. Roussel and American contend the American stock offered in exchange was valued at approximately $12.10 per share on the date of the bid, or at the sum of $6,009,600.00, making a total consideration of $6,409,600.00. Roussel accepted American's bid, and on April 29, 1971, transferred subject properties, all of Citrus' movable and immovable assets, to American on the above terms. On June 29, 1971, Roussel completed the sales to LP&L for a cash consideration of $4,200,000.00. He wound up the liquidation on June 29, 1971, sending Noe a check for $2,633.93, and 105,508 shares of American stock. The remaining Citrus assets were transferred to the holders of the other Citrus stock.
The records in the two preceding actions have been introduced herein and form part of the record before us.
This present action was filed July 26, 1971, naming Roussel and American as defendants. On said same date, Noe filed a notice of lis pendens. The petition narrates the prior proceedings between the parties, the liquidation sale by Roussel to American, and asserts Roussel's ownership of 99% of American stock at the time of said transfer. Specifically, Noe charges the sale to American was not a sale but a transfer of assets of Citrus; that the sale was for an inadequate consideration inasmuch as the property was worth at least $24,000,000.00. Noe also charges the American shares transferred to him in the liquidation were not worth the value placed thereon by American. In Articles 20 through 22, inclusive, Noe alleges Roussel acted arbitrarily in favor of American to Noe's detriment; that Roussel acted beyond his fiduciary capacity in obvious bad faith and fraud of Noe's rights to illegally acquire Noe's share of Citrus' net assets for an inadequate consideration over Noe's express objection.
Noe prayed for judgment: (1) Recognizing that all of the movables and immovables sold to American constitute part of the net assets of Citrus in liquidation; (2) *814 rescinding the sale to American insofar as it purports to affect Noe's undivided 20.8687% interest therein, and placing Noe in possession of said interest; (3) cancelling a mortgage granted by American on April 29, 1971, insofar as it purports to affect Noe's interest in the land, and (4) ordering an accounting by Roussel as liquidator of Citrus, and granting Noe judgment against Roussel, individually, and as Liquidator, for all sums or property which were not, but should have been included in distribution of Citrus' assets. Alternatively, Noe prayed for cancellation of the liquidation sale; cancellation of the above mentioned mortgage; judgment against Roussel and American for 20.8687% of $27,000,000.00 (the alleged value of Citrus' net assets, both movable and immovable); and for all general and equitable relief. Noe also prayed that he be permitted to deposit in court the stock and cash received in the liquidation.
The alleged value of American stock given in payment for the land is bitterly contested. Noe claims the value of American's shares were highly inflated on American's books and have no market value because they represent a minority interest in a Roussel controlled corporation. Noe also notes that the shares are not listed on any stock exchange. In view of our subsequent conclusion that the land was sold for an inadequate consideration, we do not consider the controverted value of American stock.
It is conceded that subsequent to the liquidation and prior to commencement of this action, Roussel offered to purchase Noe's American stock at $12.00 per share. At the commencement of the present trial, Roussel, in open court, tendered Noe the sum of $10.00 per share for the American stock provided Noe accept the offer within seven days, and also offered to sell Noe the property for $10,000,000.00.
The trial court found that $6.4 million was a fair price for a one unit immediate sale of this unique tract of land for which the trial court felt there was no true comparable in determining value. The trial court also found that the valuation of American stock at approximately $12.00 per share was fair and reasonable. In addition, the trial court found no breach of Roussel's fiduciary duty as liquidator. This latter holding was based on the premise that our law does not prohibit a liquidator from selling assets of the corporation to a corporation controlled by the liquidator, provided the sale is made in good faith and for adequate consideration. On February 7, 1973, Noe's injunction suit was dismissed by the trial court. The judgment did not, however, order cancellation of the notice of lis pendens filed in connection with the action.
Noe devolutively appealed on February 9, 1973. On March 5, 1973, Relators moved the trial court to cancel the notice of lis pendens on the contention that Noe's failure to suspensively appeal rendered executory the judgment dismissing the action for injunction. On April 2, 1973, judgment was rendered in the trial court ordering cancellation of the notice of lis pendens. The court concluded that Noe's devolutive appeal did not suspend the effect of the judgment dismissing Noe's suit. The judgment ordering cancellation of the notice of lis pendens became final upon rejection of Noe's applications to the Court of Appeal and this court for writs of review. The notice of lis pendens was then cancelled from the public records.
Relators filed a plea of mootness in the Court of Appeal, based on sales of subject property to alleged third persons not parties to this litigation. Certified copies of the sales were attached to Relator's pleadings and filed in the Court of Appeal. In this Court, Noe has appended to his brief certified copies of instruments which purportedly show that the alleged third parties are either persons interposed or Roussel's alter ego. Relators have countered by reciting in their briefs further transactions involving alleged third parties.
*815 The Court of Appeal found it unnecessary that Noe prove an inadequate price was paid for the land because the record showed a breach of Roussel's stewardship obligations. That Court reasoned that, since Roussel's appraisers valued the land at $8 million and the sale to American was for only $6.4 million, Noe was the sole loser to the extent of his percentage of the difference, namely, $345,000.00. The Court also found that American averted its share of the loss of the difference in value because American received the property which it could sell and thereby benefit to the extent of $1.3 million at Noe's expense. So finding, the Court of Appeal ordered: (1) Rescission of the liquidator's sale to American; (2) cancellation of a mortgage given by American subsequent to April 29, 1971, and recorded in MOB 67, Folio 533, Plaquemines Parish; (3) the return to American of all consideration paid for the transfer; (4) transfer of all assets of Citrus in liquidation to Roussel and Noe in their respective undivided interests, in indivision, and (5) assumption by Roussel and Noe of their respective shares of Citrus' obligations.
Relators' plea of mootness was rejected by the Court of Appeal on the ground that the Court's jurisdiction could not be divested by what the Court considered "the subterfuge of alienation to a third party", and also that the Court would not permit the orderly processes of justice to be flouted and circumvented by such a procedure.
Relators urge that the trial court properly found that Roussel did not breach his fiduciary duty; that the price paid by American for the transfer was fair; and that the value placed on American stock given in exchange for the property was a fair valuation thereof. Relators maintain the Court of Appeal erred in reversing the trial court's factual finding that Roussel did not breach his fiduciary duties.

THE FIDUCIARY OBLIGATION
Relators concede that our law imposes a fiduciary obligation upon a Liquidator who sells the assets of a corporation in liquidation, to himself or a corporation in which he has an interest, especially a controlling interest. According to Relators, the obligations of a liquidator are the same as those of a corporate officer or director except that a liquidator is not free to continue indefinite transaction of corporate affairs, but rather must expeditiously liquidate the corporation, as held in Brown v. Wholesalers, Inc., in Liquidation, La.App., 52 So.2d 321, and Todd Shipyards Corp. v. Lomm, La.App., 190 So.2d 125. Recognizing that sales of corporate assets to corporate officers or directors are held to close scrutiny, Relators suggest that, nevertheless, such transactions are judicially sanctioned provided the elements of good faith and fair value are observed. In so contending, Relators rely upon LSA-R.S. 12:84, subd. A(1), (2) and (3), which provide that no contract a corporation and one or more of its officers or directors, or between a corporation and another corporation in which its officers or directors are interested, shall be either void or voidable solely because of this reason. In further support of their position, Relators cite and rely upon General Motors Acceptance Corporation v. Hahn, La.App., 190 So. 869, and House of Campbell v. Campbell, La. App., 172 So.2d 727.
On the foregoing premise, Relators maintain Roussel was in good faith, and the record establishes a fair price was paid for the land. Relators insist that the American stock Noe received for his share of the purchase price was worth the value assigned thereto in the transaction, as established by a factual analysis of American's holdings appearing of record, and also as evidenced by Roussel's offers to purchase Noe's American stock for $12.00 per share prior to the present action and for $10.00 per share on the day of trial.
Contrarily, Noe argues that our law attaches a presumption of fraud to a fiduciary's acquisition of his principal's property, and imposes upon the fiduciary the burden of showing that the transaction was one at *816 arm's length. Further, Noe contends the record shows a calculated plan to defraud, which scheme was executed to Noe's detriment despite Noe's attempts to avoid the large financial loss which resulted.
Relators argue that the Court of Appeal erred in: (1) Reversing the factual findings of the trial court notwithstanding evidence of record constituting a reasonable basis therefor, contrary to the manifest error rule; (2) granting in effect a suspensive appeal to Noe who only devolutively appealed the judgment dismissing the present action for rescission; (3) declaring absolutely void the liquidator's sale from Roussel to American; (4) failing to consider the fairness of the price paid by American, and (5) rejecting Relators' plea of mootness by ignoring the sale of subject property to third persons not parties herein in violation of LSA-C.C.P. art. 3751; LSA-R.S. 9:2721, 2722; and LSA-C.C. art. 2266, which establish our law of public registry insofar as said principle is applicable herein. American further contends the Court of Appeal erred in casting it in solido with Roussel.
Liquidation of a corporation is an extraordinary corporate proceeding beyond the scope of ordinary business affairs usually delegated to corporate management and boards of directors. Authorization and regulation of corporate dissolution is provided by Louisiana Business Corporation Act, LSA-R.S. 12:141 through 149, among which Section 141(A) provides that a corporation may be liquidated either by voluntary or involuntary proceedings. In the case of involuntary liquidation, dissolution may be with or without judicial supervision. In the event of involuntary liquidation, judicial supervision is mandatory.
The validity and effectiveness of any corporate liquidation, voluntary or involuntary, supervised or unsupervised, depends upon its being legal, regular and equitable. Law of Corporations, Henn, West Publishing Co. 1970, §§ 340 and 348.
LSA-R.S. 12:142(A) authorizes corporate dissolution by two-thirds of the voting power present at an annual or special stockholders meeting held after notice of the proposed liquidation.
Although Relators maintain a shareholders meeting was held in this case, Citrus' liquidation was initiated by a unanimous resolution of consent authorized by LSA-R.S. 12:76, which dispenses with the necessity of a shareholders' meeting upon consent of all stock owners. The resolution, adopted July 1, 1970, was signed by Gordon and American as alleged sole shareholders. American was represented by Roussel who had full knowledge of the judicial recognition of Noe's 35% plus stock ownership of Citrus stock which was then carried in Gordon's name. On this same date, Roussel was Citrus' President and a member of Citrus' Board of Directors, having served in said capacities at least since June, 1968. Noe had no notice of this proceeding.
Upon application of shareholders holding not less than 25% of a corporation's voting power, a nonjudicial liquidation may be converted into a liquidation under judicial supervision, and the liquidator required to furnish bond. LSA-R.S. 12:142, subd. E.
The duties and obligations of corporate officers and directors are provided for by LSA-R.S. 12:91, which pertinently reads as follows:
"Officers and directors shall be deemed to stand in a fiduciary relationship to the corporation and its shareholders and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment and skill which ordinary prudent men would exercise under similar circumstances in like positions...."
In the event of corporate liquidation, all of the rights, powers and duties of corporate officers and directors, are vested in the liquidator, whether appointed by the *817 shareholders or the court. LSA-R.S. 12:141, subd. C.
LSA-R.S. 12:145, subd. C confers very broad power and authority on liquidators of business corporations. The manner of performance of a liquidator's duties is mandated by LSA-R.S. 12:145, subd. G, which recites:
"In the performance of his duties, each liquidator shall be bound to exercise that care and prudence in the listing, custody, possession, control and disposition of the property and moneys of the corporation coming into his hands, and in the proper accounting therefor, and distribution thereof, as by law is imposed upon fiduciaries."
Our Business Corporation Act, LSA-R. S. 12:1 et seq., is silent as to the validity of contracts between a corporation in liquidation and one of its corporate stockholders, conducted through a liquidator vested with a financial interest in the corporate shareholder. We note, however, the analogous provisions of LSA-R.S. 12:84, which prescribes criteria for determining validity of transactions between corporations and other entities in which corporate officers and directors have a financial interest, and which states:
"A. No contract or transaction * * * between a corporation and any other * * * foreign corporation * * * in which one or more of its directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for this reason, * * * if:
(3) The contract or transaction was fair as to the corporation as of the time it was authorized, approved or ratified by the board of directors, committee, or shareholders."
The foregoing statutory provisions clearly impose a fiduciary duty upon a corporate liquidator. Relators contend the trial court properly assessed the extent of Roussel's fiduciary duty to be that the transfer of Citrus' assets be for a fair consideration. Conversely, Noe contends our jurisprudence requires not only fair dealing on the part of a fiduciary but that where, as here, the fiduciary acquires the principal's property, fraud, is presumed and the fiduciary bears the heavy burden of establishing that the transaction was negotiated and entered into at arm's length. Relators suggest that the Court of Appeal erred in finding a breach of fiduciary duty without specifically finding that the price paid was inadequate. Noe urges that the Court of Appeal properly applied the "arms length transaction test", and correctly held Roussel to be at fault.
In General Motors Acceptance Corporation v. Hahn, La.App., 190 So. 869, it was held that a corporate officer may validly acquire corporate assets "provided the transaction is in good faith and the consideration paid is adequate."
In House of Campbell v. Campbell, La. App., 172 So.2d 727, a liquidator sought rescission of a sale of corporate assets to a former corporate officer. The action was brought pursuant to former LSA-R.S. 12:36, the source of present LSA-R.S. 12:91. It is noteworthy that former LSA-R.S. 12:36 established fiduciary duties upon officers and directors to their respective corporations only. With the adoption of the Louisiana Business Corporation Act in 1968, the fiduciary duties of officers and directors were, by LSA-R.S. 12:91, above, expressly extended to shareholders. While Campbell, above, addresses itself to the fiduciary duty owed to corporations, the following language appearing therein is applicable in this instance:
"The prevailing rule in the United States is that a purchase of corporate property from the corporation by a corporate officer or director is not absolutely void but merely voidable. If the contract is not fair to the corporation it has a just and legal right to set the sale aside. While the Courts have not meticulously *818 defined what is `fair,' they have closely scrutinized each transaction to determine its fairness to the corporation. Because of the fiduciary relationship between the corporation and director, the burden of proof is on the director to prove his good faith in entering into the transaction and also the inherent fairness from the viewpoint of the corporation.
* * * * * *
The rule in Louisiana, therefore, is that a corporation has a right of action to set aside a transfer of property from the corporation to one of its directors. The contract or transaction is not void but merely voidable at the option of the corporation. In such an action the director has the burden of proof of fairness to the corporation and that he was acting in good faith; in effect he must prove that the transaction was one negotiated and entered into at arm's length."
Applying the foregoing test, Campbell concluded the defendant officer did not sustain the burden of proving that the transaction possessed all the characteristics of an arm's length bargain. Accordingly, the sale was rescinded.
It is of no moment that Campbell, above, involved a sale between a corporation and its officer-director, and the instant matter concerns a transaction between a corporate liquidator and a foreign corporation in which the liquidator had a financial interest. LSA-R.S. 12:84, above, is expressly applicable to transactions between a corporation and a foreign corporation in which a fiduciary has a financial interest. American is a foreign corporation.
In the early case of Michoud v. Girod, 45 U.S. 504 (4 Howard) 11 L.Ed. 1076, which involved the fiduciary obligations of executors who acquired property entrusted to them, the United States Supreme Court held such a transaction carries fraud on its face. This rule has become firmly embedded in the common law. It imposes upon a fiduciary the obligation of refuting the presumption which obtains in such cases, and also the obligation of establishing that the transaction was an arm's length matter. See also, Jackson v. Ludeling, 88 U.S. 616, 21 Wall. 616, 22 L.Ed. 492 (1874); Mason v. Pewabic Mining Co., 133 U.S. 50, 10 S.Ct. 224, 33 L.Ed. 524 (1890).
In our jurisprudence, we note Cuggy v. Zeller, 132 La. 222, 61 So. 209 (1913), which involved an instance of an agent acquiring his principal's property. In commenting upon the obligation of the principal, the court, citing Michoud v. Girod, above, stated such a transaction carries fraud on its face. We also note Assunto v. Coleman, 158 La. 537, 104 So. 318 (1925), to virtually the same effect.
In this instance, we do not have to rely upon a presumption of fraud as held in Cuggy v. Zeller, above, and Assunto v. Coleman, above. The record before us discloses that Roussel has breached his fiduciary duty in that his actions will not stand the test of rigorous scrutiny as required in Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), which establishes the following criteria:
"A director is a fiduciary.... Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director not only to prove good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. (Citations omitted.) The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain (footnote with citation omitted). If it does, equity will set it aside."
We hold, therefore, that an agent who acquires his principal's property, or one who otherwise acts in a fiduciary capacity, bears the burden of establishing that the transaction was an arm's length *819 affair. This means that the agent or fiduciary must handle the matter as though it were his own affair. It also means the agent or fiduciary may not take even the slightest advantage, but must zealously, diligently and honestly guard and champion the rights of his principal against all other persons whomsoever, and is bound not to act in antagonism, opposition or conflict with the interest of the principal to even the slightest extent. The reason for the rule is obvious.
In our preliminary factual presentation, we have listed the numerous occasions on which Roussel manipulated Noe's stock interest in furtherance of Roussel's interest and advantage, to the disadvantage and detriment of Noe. The record also shows that in 1967, one William F. Kelley became interested in Citrus' holdings and caused an appraisal thereof to be made by E. A. Tharpe of International Appraisal Company, New Orleans, Louisiana. On October 30, 1967, Tharpe appraised the property at $14.7 million. Although Roussel did not procure or order this appraisal, he was fully aware of its existence and the amount thereof. On September 1, 1969, Tharpe again appraised the property, this time at Roussel's request. On this occasion, Tharpe valued the lands at $25 million. Both of Tharpe's appraisals were introduced by Noe as proffered evidence upon the trial court sustaining Relators' objection to their admissibility. We agree with Noe's contention that the documents were admissible insofar as they bear upon Roussel's knowledge of the value of the property, which circumstance is relevant in determining the alleged breach of Roussel's fiduciary duty. From the record, it may be reasonably inferred that Roussel used this appraisal in valuing the Citrus stock then listed among American's assets as having a value of $13 million.
Between May 18, 1969 (the date of the Gulf leases), and December 31, 1969, Roussel published an elaborate full color brochure entitled "Citrus, 16,200 Acres for Industry, Living and Recreation." The booklet proclaimed 16,200 acres of prime industrial land available for leasing. The pamphlet cited the Gulf leases and extolled the virtues and advantages of the land for industrial, recreational and living purposes. The booklet noted the availability of deep water river frontage to accommodate ocean going vessels and accessibility to the nearby intracoastal canal waterway alternate route which can accommodate barge traffic. Additionally, the pamphlet pointed out the availability of oil, gas, plentiful water supply and other raw materials required by petro-chemical industries. The availability of plentiful lands for housing accommodations and recreational activities for industrial employees was also noted. Mention was made in the pamphlet of a $3.6 billion industrial investment along the lower Mississippi River since the year 1946. Roussel purchased 3,000 of these brochures and distributed 1,400 in business, industrial and financial circles. The brochures cost approximately $20,000.00, which Roussel paid personally.
Notwithstanding the foregoing, Roussel's liquidation advertisement of the property for sale described the land as industrial and grazing land. The description of the land, and the nature of the advertisement, was not conducive to arousing the interest of prospective purchasers. To say the least, the ad was misleading.
Roussel declined to have the property appraised before the liquidation sale. When queried on this score, he explained that he was one of the largest and most knowledgeable landowners in the New Orleans area, and he knew of no one who was better informed than he as to land values. He stated he used his own judgment in determining the land value and deciding that American's offer was fair. We reject Roussel's testimony, and that of the Board Members of American who testified that Roussel took no part in formulating the bid which American submitted. We note that these parties were either relatives, associates *820 or employees of Roussel. The record justifies the inference that Roussel alone makes the major decisions with respect to the businesses he controls. It also shows that, as Liquidator of Citrus, Roussel handled the liquidation as though he were sole owner. He alone made all decisions. The inference is also clear that he ignored all advice which did not correspond with his own judgment. Roussel's business philosophy, as revealed by the record, compels the finding that, as 99% owner of American, it is inconceivable that Roussel did not dictate the terms of American's offer. The record precludes the reasonableness of a contrary conclusion.
We likewise conclude Roussel's breach of his fiduciary duty has been demonstrated by his constant manipulation of Noe's stock to suit Roussel's individual purposes and aims. Additionally, we find that Roussel breached his duty by knowingly selling the property for an inadequate consideration.

MOOTNESS
This plea, filed in the Court of Appeal, is based on the sale of subject properties to alleged third parties in good faith, subsequent to cancellation of Noe's notice of lis pendens. Noe resisted the plea contending the alleged third parties are Roussel's alter ego. Noe also maintains that if the plea is well founded insofar as concerns title to the disputed property, he is entitled to judgment in damages against Roussel and American in solido pursuant to Noe's alternative prayer.
The judgment of the trial court rejecting Noe's claims in toto was rendered February 7, 1973. It did not order cancellation of the notice of lis pendens. On February 9, 1973, Noe devolutively appealed and posted his appeal bond on February 28, 1973. On March 5, 1973, after expiration of the delays for the taking of a suspensive appeal, Relators filed in the trial court a rule entitled "Motion to Give Effect to Judgment", urging cancellation of the notice of lis pendens from the Mortgage Records of Plaquemines Parish. Relators contended that since Noe had not suspensively appealed the judgment dismissing his action, and the delays had expired for taking a suspensive appeal, the trial court should give effect to its judgment pursuant to LSA-C.C.P. arts. 2088(7) and 3753.
On April 2, 1973, the trial court rendered judgment ordering cancellation of the Notice of Lis Pendens on the ground that the devolutive appeal did not suspend the effect of the judgment of dismissal. On April 4, 1973, Noe applied to the Court of Appeal for relief from the judgment cancelling the Notice of Lis Pendens. The application was denied May 16, 1973, upon the Appellate Court finding that the judgment of the trial court had become executory. That same day, Noe applied to this Court for supervisory writs, which application was denied May 29, 1973. The Notice of Lis Pendens was cancelled. Subsequently, on June 11, 1973, Noe recorded another notice of Lis Pendens in the mortgage records of Plaquemines Parish. This notice was filed under the docket number assigned this present matter in the Court of Appeal. Noe maintains filing of the second Notice of Lis Pendens is authorized pursuant to LSA-C.C.P. art. 3751, which provides for such a notice to be recorded and effective with respect to "the pendency of an action or proceeding in any court." Noe also contends this latter notice is effective as to all persons, including third parties, purchasing subsequently to its recordation.
In the Court of Appeal, Relators filed certified copies of two acts, dated August 16, 1973, purportedly sales of subject properties by American to third parties. These transactions occurred after cancellation of the original notice, but subsequent to recordation of the notice filed June 11, 1973. One sale, of an undivided half of subject property, was to Giovanni Rametta for a recited consideration of $100,000.00, and other good and valuable consideration. *821 The other was for the remaining half to a corporation known as Citrus Lands of Louisiana, Inc. (Citrus II), for a stated consideration of 50,000 shares of Citrus II stock. Relators also filed a certified copy of a transfer from Rametta to Citrus II of the one-half interest acquired by Rametta from American. In consideration, Rametta received 50,000 shares of Citrus II stock.
In this Court, Noe appended to his brief a certified copy of the Articles of Incorporation of Citrus II, listing the date of incorporation as August 15, 1973, and American as incorporator. The articles show that Clifton Carl, Roussel's attorney of record herein, is agent for service of process of Citrus II, whose address is the same as Roussel's business address. Citrus II's directors are listed as Roussel, Rametta and Ronald Mistrot, a Roussel employee.
Relators maintain that upon cancellation of the original Notice of Lis Pendens, there was nothing of record to charge third parties with notice. They also assert that the Notice of Lis Pendens filed by Noe while his devolutive appeal was pending in the Court of Appeal is of no legal efficacy. So arguing, they urge that the sales from American to Rametta and Citrus are in fact sales to good faith third persons who are not parties to this litigation, which parties may rely upon the public records, and whose rights, as such, may not be adversely affected by judgment herein. In this regard, Relators are joined by various banking, financial and commercial institutions who have been permitted to file amicus curiae briefs herein. All point out that the decision of the Court of Appeal in disregarding the transfers to third persons would cause consternation in business and financial circles if allowed to stand.
Our law is settled to the effect that a third party purchasing in good faith may rely upon the ownership status of real property as reflected on the face of the public records. LSA-C.C.P. art. 3751; McDuffie v. Walker, 125 La. 152, 51 So. 100. Prior to adoption of Act 22 of 1904, the mere filing and pendency of suit constituted notice to third parties of plaintiff's claim against real property. LSA-C.C. art. 2453; Kohn v. Byrne, 10 Rob. 113. Act 22 of 1904 became LSA-R.S. 13:3541-3543. In 1960, these provisions were included in LSA-C.C.P. arts. 3751-3753. Article 3751, above, provides that the pendency of an action affecting title to real property does not constitute notice to a third person not a party to the action, unless notice of pendency of the suit is filed as required by Article 3752. Article 3752 provides requirements for the form and content of the notice, and is not pertinent herein.
We find that the second notice of Lis Pendens, filed while the appeal was pending, and after the first notice had been cancelled pursuant to the judgment ordering its cancellation, does not effect notice of the pendency of the action. LSA-C.C.P. arts. 3751 and 3753 provide pertinently:
Art. 3751:
"The pendency of an action or proceeding in any court, state or federal, in this state affecting the title to, or asserting a mortgage or privilege on, immovable property does not constitute notice to a third person not a party thereto unless a notice of the pendency of the action or proceeding is made, and filed or recorded, as required by Article 3752."
Art. 3753:
"When judgment is rendered in the action or proceeding against the party who filed the notice of the pendency thereof, the judgment shall order the cancellation of the notice at the expense of the party who filed it, and as part of the costs of the action or proceeding."
These provisions indicate intent that a Notice of Lis Pendens must be filed while the action is pending in the trial court, that is, at least before judgment is rendered therein. The better practice dictates that *822 such a notice be recorded as soon as possible after institution of suit to protect plaintiff's interests against alienation by defendant. The statute impliedly precludes filing of notice after judgment at trial level because Article 3753 directs the trial court to order cancellation of the notice upon dismissal of plaintiff's action. In this instance, the judgment ordering dismissal of Noe's action did not order cancellation of the timely filed notice. However, a subsequent judgment did order such cancellation, and that judgment has become final and the notice has been cancelled pursuant thereto. Regardless of the correctness of said decree, it has become final. When the original notice was cancelled pursuant to judgment, the effect of the notice terminated and the public record stood, in effect, as though no notice had been filed of record.
We conclude the notice filed by Noe on June 11, 1973, was ineffective. This precise issue was decided by us in Continental Securities Corporation v. Wetherbee, 187 La. 773, 175 So. 571. In Wetherbee, notice was filed two days after judgment was signed in the trial court. We held such a notice ineffective because the statutory requirement of cancellation of the notice could not be complied with under these circumstances. In Wetherbee, above, we also observed that filing a notice which would be deemed to be effective, after rendition of a judgment of dismissal, would afford the losing plaintiff the opportunity to appeal devolutively with all the benefits attending a suspensive appeal. We so held in Wetherbee, above, because, if the judgment of dismissal does not order cancellation of the notice because no notice was filed as of the date of judgment, plaintiff would need only to take a devolutive appeal since there would be nothing in the judgment to suspend except perhaps the payment of costs. Kittredge v. Grau, 158 La. 154, 103 So. 723.
Where no notice is filed prior to judgment, and judgment of dismissal does not order cancellation, subsequent filing of an effective notice would give plaintiff an advantage not contemplated by the statute. To make such a notice effective to protect plaintiff's rights deprives defendant of his right to compel plaintiff to appeal suspensively from a judgment which dismisses plaintiff's claim in order for plaintiff to protect plaintiff's rights. This follows because our interpretation of the statute requires that a judgment of dismissal order cancellation of a timely filed notice, in which event plaintiff would have to appeal suspensively to preserve the status of the property.
In essence the Court of Appeal avoided the posed third party purchaser issue by holding that a sale to a third party could not divest the court of its jurisdiction of the case, and that such transactions were to be disregarded in the interest of promoting orderly proceedings. In so doing, the Appellate Court erred. If third parties in good faith purchased subject property at a time when no effective Notice of Lis Pendens was filed of record, Noe's devolutive appeal could not prevent their acquisition of just title to the lands conveyed. LSA-C.C.P. art. 3751; McDuffie v. Walker, above. The error of the Court of Appeal consisted in ordering rescission of the liquidator's sale without finding that the nonlitigant, third party purchasers were not entitled to rely upon the cancellation of the original notice, and also without finding that the second notice was legally effective.
Academically, the sale to Citrus II appears suspect. The conveyance to Rametta seems tainted in that Rametta is a director of Citrus II. The stock transfers to Artfer, Inc. present an aura of legitimacy, and perhaps involve third parties in good faith. Nevertheless, we have no authority in this instance to determine the validity of these transfers because, to do so, would affect the rights of third persons not parties herein.
Under the circumstances, we find that third parties in good faith had the right to *823 rely upon the public records as showing no effective notice of lis pendens affecting subject properties following cancellation of the initial notice filed in this case.
Assuming we could properly consider the third party purchaser issue, and find that said purchasers were not entitled to rely upon the public record because of fraud, we perceive certain problems attending rescission of the liquidator's sale. In such event, Noe and American would be recognized as owners and placed in possession of their respective interests in indivision. While Noe asserts the contrary, the record convinces us that the property would be difficult of division in kind on an 80%-20% ownership basis. This is due mainly to the size of the tract and the location of the two pumping stations which drain the protected acreage. We concede that the property could be readvertised and sold.
To put this protracted and costly matter to rest without further litigation, we assume the controversial third party sales to be valid. On this assumption, we reverse the decision of the Appellate Court, and sustain Relators' plea of mootness insofar as this action seeks rescission of the liquidator's sale. See Baillio v. Wilson, 5 Mart.N.S. 214; Wetherbee v. Lodwick Lumber Co., Inc., 194 La. 352, 193 So. 671.
We so hold because Noe's alternative claim for damages remains unaffected, and Noe can be adequately compensated by an appropriate monetary award.

DAMAGES
The extent of Noe's monetary recovery is the difference in value between the sale price and the true value of the land on the date of sale.
Noe produced two appraisers, Omer Kuebel and Lennis X. Lamulle. Acting independently of each other and using the market data approach, these witnesses valued the property as of the date of the liquidation sale. They arrived at valuations of $26.6 and $28 million, respectively, for the nine plantations appraised as individual units, together with the Wilkinson Canal, Deer Range Canal, Hermitage Ridge and Lake Hermitage. They considered all lands within the drainage levee system, 13,160 acres, to be industrial property, and assigned values thereto ranging from $3,500.00 to $1,250.00 per acre depending upon river frontage, elevation and other pertinent factors. Kuebel appraised this acreage at $25.4 million; Lamulle found a value of $26.6 million. The remaining 2,597 acres of undrained land was appraised by Kuebel at $1.2 million, and by Lamulle at $1.4 million, at values ranging from $150.00 per acre for the undrained rear of St. Rosalie to $50.00 per acre for the bed of Lake Hermitage. They discounted their appraisals, reaching a value of $17.5 million for a one unit immediate sale of the entire acreage, and each assigned this value as of the date of the liquidation sale.
Kuebel spent four months making his appraisal. He employed three groups of comparables, including numerous sales of fairly large unimproved plantation lands along the River between Baton Rouge and New Orleans. Admittedly none were comparable in size to subject tract. Kuebel also used a group of sales and transactions involving lands along the River below New Orleans. Included in these are the sales from Citrus to Elevator, the leases from Citrus to Gulf, and the Citrus sale to L.P. & L. Kuebel's third category was a group of sales of very small acreage tracts sold for small industrial and camp sites along the alternate Intracoastal Canal route located within five or six miles of subject tract. In all, Kuebel employed approximately 50 comparables, each of which he personally visited and inspected insofar as was possible.
Lamulle used 19 comparables, 17 of which were also used by Kuebel. Included in Lamulle's comparables were the Elevator, Gulf and L.R. & L. transactions. Lamulle *824 also used as comparables some of the Intracoastal Canal sites employed by Kuebel.
A joint appraisal was made for Relators by Thomas F. Dupree and Jean Felts. These experts, also using the market data concept, valued the property, as of June 29, 1971, in the sum of $7.8 million. Each made his or her individual appraisal of the separate tracts. Both considered the industrial lands to be limited to the area lying between the River and the Highway, an area comprising 2,183 acres, approximately 20% of the total protected area. The remaining drained area lying between Highway 23 and the rear levee system, approximately 10,133 acres, were considered grazing lands by Dupree-Felts on the ground the lands were too low, not sufficiently drained and protected, and lacked soil bearing qualities sufficient to support industrial construction and use. They valued the 2,183 acres of industrial lands at from $1,000 to $2,000 per acre, and thus gave a value of $2. million for this part of the tract. Assigning a value of $350.00 per acre to the grazing lands, they valued this 10,000 plus acres at $3.5 million. The rear of St. Rosalie, Hermitage Ridge, Wilkinson Canal and Lake Hermitage, they valued at between $50.00 and $150.00 an acre. They thusly reached a total of $7.8 million for the entire property. Employing a discount factor of 10% over a five year period, Dupree-Felts arrived at a one unit immediate sale value of $6,118,765.00.
Mrs. Felts' comparables were mostly sales of property along the River above New Orleans. She ascertained investment value on the ground that the land had to be sold as a unit by June 30, 1971, her appraisal having been made more than one year later. She utilized sales of industrial, grazing lands and marshlands. All of her comparables were purchases by users, not investors or speculators. Nineteen of her comparables were of river front lands. Of this number, only 8 were the same as those employed by Kuebel. She also used thirteen other comparables, one being a 5 acre tract situated in Pointe Coupee Parish, and another a tract located in St. Landry Parish. She considered the Gulf leases but did not use the Elevator and L.P. & L. sales. She did not consider a sale on June 20, 1967 by P. Chauvin Wilkinson, et al. to L.P. & L. for $20,000.00, or a per acre price of $1,361.00. Neither did she consider a sale dated March 7, 1972, from Ledet, et al. to L.P. & L. of 15.20 acres fronting on the River side of St. Rosalie, and which connect Gulf's main 600 acre tract with its smaller parcel situated on the south side of Highway 23. This sale was for $6,400.00 per acre. Mrs. Felts did not use any of the other several comparables situated in Plaquemines Parish and vicinity which were employed by Kuebel and Lamulle. Mrs. Felts explained that her valuations were based on the sale to speculators within a five year period. She did not value each plantation separately, but appraised the whole according to the classifications noted. In making her appraisal, she considered the River frontage, elevation, hydrographic data, depth of tracts, soil bearing capacity data and other relevant factors.
Dupree also considered as industrial land only the area between the River and the Highway. He also considered as grazing land all property between the Highway and the protection levee to the rear. In reaching his valuations, he used many of the same comparables employed by Mrs. Felts. He did not use the L.P. & L. sale as a comparable, and he was unaware of the Elevator sales until his appraisal had been completed. He did not use as comparables any sales of land in Plaquemines and adjacent parishes. He explained that he and Mrs. Felts each arrived at their valuations independently. They then consulted and, where values differed, adjustments were made and mutually agreeable values were fixed. He too was instructed to value the property on the basis of its sale within a year to comply with Section 337. Dupree classified all drained lands between the *825 highway and the rear levee system as grazing lands, for the same reasons given by Mrs. Felts.
All of the appraisers agree there are no truly comparable sales of so vast a tract. We find, however, that the comparables employed by Kuebel and Lamulle are of lands more nearly comparable to subject tract than those used by Dupree-Felts. As a rule, the Kuebel-Lamulle comparables were of river front sales of fairly large plantations or portions thereof. Their comparables also included sales from Plaquemines and adjacent parishes which transactions were ignored by Dupree-Felts. Also, the prior sales and leases of portions of subject properties were considered by Kuebel and Lamulle, but were mostly ignored by Dupree and Felts. While the sale to L.P. & L. at $6,400.00 per acre does not set the value of the entire tract, it should not be disregarded in an appraisal of the land. The same applies to the Gulf leases and the sale to Elevator.
The record does not support the Dupree-Felts classification of 10,000 acres beyond Highway 23 as suitable for grazing purposes only. The land is well drained. By far the major part thereof is free of standing water and is dried out and ready for use as evidenced by farming operations and other activities being conducted thereon at present. The alleged inability of the soil to support industrial construction is refuted by expert testimony produced by Noe.
J. Bres Eustis, Engineer and expert soil analyst, testified that, while the major portion of this area is former marshland, it is underlain by clay and sand strata possessing bearing qualities required for industrial construction. Mr. Eustis' conclusion was based on personal knowledge, study of government charts, and Eustis' own experience as a consultant for industries which have located in the general area. Eustis' testimony as well as that of other experts, also confirms that the levee system is adequate to protect the land from normal tide overflow, and the internal drainage and pumping system is quite capable of keeping the land free of surface water. He considered the land dried out and ready for industrial use.
We deem the Kuebel-Lamulle appraisals of considerably more probative value than those of Dupree-Felts, and therefore attach much greater weight to the former in reaching our evaluation of the land at the time of the liquidation sale. We do not, however, accept the Kuebel-Lamulle determination that all drained acreage south of the highway is industrial in character. By the same token, we do not accept the Dupree-Felts conclusion that none of such property is suitable for industrial purposes, and that the whole thereof may be employed for grazing use only. Our consideration of the voluminous appraisal testimony leads us to conclude that the drained area fronting on the south side of Highway 23 is best classified as at least light industrial, commercial, residential or recreational property for some distance toward the rear of the tract, giving this portion of the tract a higher valuation than the $350.00 per acre attributed to it by Dupree-Felts. We likewise find that the value of the 2,113 acres classified by Dupree-Felts as industrial is of greater value than the Dupree-Felts appraisal figures thereon. Additionally, we find the Kuebel-Lamulle appraisal of the drained acres south of the highway to be an overvaluation to some extent because, as noted, we do not deem this entire acreage to be industrial.
Considering all of the above circumstances and findings and, as we have noted, giving much greater weight to the Kuebel-Lamulle appraisals, we determine the value of subject tract on June 28, 1971, to be $12.5 million. We will assess Noe's damages against Roussel and American accordingly.
American suggests that, in any event, judgment should not be rendered against it because it is a separate entity, and therefore may not be cast for Roussel's derelictions.
*826 As has hereinabove been shown, Roussel is American. He owned, directly or indirectly, 99% of the corporation's stock on the day of the liquidation sale. We have found that Roussel dictated the terms of American's offer, and that American was the sole beneficiary of Roussel's actions. Our jurisprudence holds that a wholly owned corporation is the alter ego of the party owning the corporation, and that, in such instances, the corporate veil may be pierced. Equity will not permit a corporation to assert its separate entity status in cases of this nature. Keller v. Haas, 202 La. 486, 12 So.2d 238.
It is ordered, adjudged and decreed that the judgment of the Civil District Court, Parish of Orleans, Division I, rejecting the alternative plea of plaintiff, James A. Noe, for damages, be and the same is hereby annulled, reversed and set aside.
It is further ordered, adjudged and decreed that the judgment of the Court of Appeal, Fourth Circuit, reversing the judgment of the District Court, and ordering rescission of the sale of land and movables from Louis J. Roussel, Liquidator, Louisiana Citrus Lands, Inc., to American Benefit Life Insurance Company of Alabama, dated April 29, 1971, and ordering cancellation of the mortgage dated April 29, 1971, by American Benefit Life Insurance Company of Alabama, recorded in MOB 67, Folio 533, Plaquemines Parish, Louisiana, be and the same is hereby annulled, reversed and set aside.
It is further ordered, adjudged and decreed that there be judgment herein in favor of petitioner, James A. Noe, and against defendant, Louis J. Roussel and American Benefit Life Insurance Company of Alabama, in solido, in the sum of 20.8687% of the sum of twelve million five hundred thousand and No/100 ($12,500,000.00) dollars, or the sum two million six hundred eight thousand five hundred eighty-seven and 50/100 ($2,608,587.50) dollars, together with legal interest thereon at the rate of 7% per annum, from date of judicial demand, until paid, and all costs of these proceedings, including, but not limited to, expert witness fees.
It is further ordered, adjudged and decreed that Petitioner, James A. Noe, return to defendant, American Benefit Life Insurance Company of Alabama, the sum of $2,633.93, and the 105,508 shares of American Benefit Life Insurance Company of Alabama common stock received by Noe from Louis J. Roussel, Liquidator.
Reversed and rendered.
MARCUS, J., recused.