KING, Judge.
There are two issues presented on appeal for consideration by this court. The first issue is whether or not the trial court was correct in rendering judgment against the defendant for the salvage value of fire-damaged cottonseed and its removal costs, where defendant had already paid the difference in the value of the cottonseed before the fire and the cottonseed’s salvage value after the fire. The second issue is whether or not the court was correct in assessing penalties and attorney’s fees against the defendant for failure to pay the damage claim pursuant to the terms of its insurance policy.
Peoples Bank and Trust Company (hereinafter plaintiff) brought this suit in its capacity as assignee of the proceeds of a fire and extended coverage insurance policy issued to Louisiana Cottonseed, Inc. (hereinafter LCI), against Lloyds of New York (hereinafter Lloyds) claiming that Lloyds refused to pay, but was in fact liable, for the salvage value of bulk cottonseed owned by LCI and damaged in a fire of unknown origin. The trial court rendered judgment in favor of the plaintiff and against Lloyds for $91,673.68, the salvage value of the fire damaged cottonseed and the costs incurred in removing it, and for penalties of 12% and attorney’s fees of $25,000.00 because of defendant’s arbitrary and capricious failure to pay the claim. Lloyds appeals. We affirm.
FACTS
Louisiana Cottonseed, Inc. was in the business of buying and selling cottonseed for cattle feed. LCI stored the cottonseed at its facility in Alexandria, Louisiana. On June 7, 1985, a fire of unknown origin arose in one of the storage tanks at the facility. The fire, and especially the water used to extinguish the fire, damaged the cottonseed in the storage tank beyond any possible utility for LCI. Lloyds of New York had issued a fire and extended coverage insurance policy to LCI insuring such loss. The three principals of LCI were Peter E. Cloutier, Jr., W.A. Bradley, Jr., and L.J. Melder (hereinafter Melder), with Melder being the person primarily responsible for the daily operations at LCI. Immediately after the fire, Melder telephoned the agency which had issued the Lloyds policy and reported the loss. Melder sought to limit the losses from the fire by both LCI and Lloyds, by providing security, using extra employees to remove and salvage the maximum amount of cottonseed possible, and by assisting Lloyds in finding a salvage buyer for the damaged cottonseed.
An adjuster, C.H. “Hank” Slaight, Jr. (hereinafter Slaight), was dispatched by Lloyds to determine the magnitude of the loss. On behalf of Lloyds, Slaight performed his duties with the aid of Melder and Mike Blackwell, an expert in commodities salvage. Slaight was to determine the loss by (1) ascertaining the quantity of cottonseed destroyed; (2) ascertaining the amount of damaged cottonseed remaining; (3) placing a value on the destroyed cottonseed in accordance with the terms of the policy; (4) valuing the salvage value of the damaged cottonseed that remained; and (5) reaching agreement on the amount to be paid to the insured. There was uncertainty as to exactly how much cottonseed was actually in the storage tank at the time of the fire, since there were two storage facilities on the property which discharged through a common auger system, so the exact amount of the destroyed and damaged cottonseed could only be estimated until it was actually removed. On June 11, 1985, the Lloyds adjuster, Slaight, and the LCI representative, Melder, tentatively agreed that the estimated loss due to the named insured, LCI, was for 1,500 tons of cottonseed destroyed, or approximately $167,460.00, subject to actual verification.
Both Slaight and Melder knew that it was imperative to move the damaged cottonseed to a salvage buyer as expeditiously as possible to prevent further spoilage and loss. Melder advised Slaight about a salvage seed buyer, Dean Billings. Billings had an open account with LCI and had conducted business with them in the past. *1309 Lloyds, through Slaight, arranged for a sale of the damaged cottonseed to Billings. A price of $30.00 per ton for the damaged cottonseed was offered by Billings and agreed upon by Lloyds through Slaight. Upon the suggestion of Slaight, Melder had a letter prepared which constituted a contract of sale. The contract stipulated the object, price, quantity and delivery terms of the sale from Lloyds to Billings. It provided that all invoices would be made by LCI and that all payments by Billings would be made directly to LCI. It further provided that Billings would be liable for any and all expenses in connection with the cottonseed, including any loading charges and charges for the removal of the damaged cottonseed from the fire damaged storage tank. Slaight encouraged Melder to invoice Billings directly so that LCI could receive the payment for the salvaged cottonseed without the money first going through Lloyds.
Lloyds made a total payment to LCI in the amount of $160,583.24. The first installment was $95,958.48, which represented 80% of the difference between the tentatively estimated pre-fire value of the destroyed cottonseed and the salvage value of the fire damaged cottonseed. The second payment made was $64,624.76. In short, Lloyds paid LCI the difference in value between the cottonseed actually destroyed, as if it were undamaged, and the salvage value of the fire damaged cottonseed of $30.00 per ton that Billings contracted to pay to Lloyds and which was estimated to be 1,500 tons.
Two months after the last of the damaged cottonseed had been shipped by LCI to Billings, LCI advised Lloyds through Slaight that Billings was delinquent in his payment for the damaged cottonseed. In a letter to Slaight and Lloyds, LCI stated that it considered Billings an agent of Lloyds and, therefore, held Lloyds responsible for the failure of Billings to pay the invoices. ■
On ¿arch 3, 1986, plaintiff, Peoples Bank and Trust Company, brought suit against Lloyds, Billings, LCI, and the three principals of LCI, Peter Cloutier, Jr., W.A. Bradley, Jr. and L.J. Melder. The suit against LCI and the individual principals was for money owed to plaintiff and was based upon a promissory note and several written guaranties. The suit against LCI, Lloyds, and Billings was for the fire loss damages which LCI had assigned to plaintiff as additional security for LCI’s promissory note owed to plaintiff. This claim for the damages for the fire loss was brought in plaintiff’s capacity as assignee of all the claims, rights, and causes of action that LCI had against Lloyds pursuant to a fire and extended coverage insurance policy, Policy Number 14499, issued by Lloyds to LCI for the period from November 20,1984 to November 20, 1985. The trial court found plaintiff presented a prima facie case against LCI and the individuals, as guarantors, and rendered judgment against them. The court also rendered judgment in favor of plaintiff and against LCI, Lloyds, and Billings on the claim for the salvage value of the damaged cottonseed, its removal costs, and penalties and attorney’s fees resulting from the fire loss. Lloyds timely appeals the judgment against it.
LAW
Lloyds was obligated under its policy to pay LCI for all direct losses caused by the fire. Lloyds does not dispute its obligation to pay LCI for the value of the destroyed cottonseed. However, Lloyds contends that the cottonseed was only partially damaged, since the remaining damaged cottonseed could be sold for salvage, and that Lloyds was therefore only obligated to pay LCI the difference in value between the cottonseed in its pre-fire condition and in its damaged condition after the fire. The damaged cottonseed remaining after the fire was of no utility to LCI and could not be sold by it in its retail business and its total loss was proximately caused by the fire. Lloyds was obligated to pay LCI for the value of the entire loss of the cottonseed. Whether or not Lloyds could mitigate its loss did not affect Lloyds’ obligation to pay LCI for the total loss.
It is well recognized that an insured can be the agent of his insurer. Richard v. *1310 Am. Federation of Unions, Etc., 378 So.2d 564 (La.App. 3 Cir.1979). There is ample evidence in the record to support the trial court’s finding that L.J. Melder was acting as an agent for Lloyds and its adjuster, Hank Slaight, in attempting to mitigate the fire loss, aiding Slaight in determining and adjusting the loss, and negotiating the sale of the salvage for Lloyds to Dean Billings. The trial court found that, “Mr. Melder could have walked away from the fire, the seed salvaging operation and the sale of the salvage had he chosen to, but he did not. He had done business for years with Insured Lloyds and he sought to reduce their losses for no reasons apparent to the court other than to maintain a good business relationship.” The trial court found that Melder acted not only prudently, but also expeditiously to assist Lloyds with respect to finding an immediate buyer for the damaged cottonseed. We do not find the trial court clearly wrong or manifestly in error in finding that Billings was the purchaser from Lloyds of the fire damaged cottonseed for its salvage value.
Lloyds contends that Billing had an open account with a previous balance with LCI and this fact made Melder’s negotiations with Billings a breach of his fiduciary duty, citing Noe v. Roussel, 310 So.2d 806 (La.1975) in support of their argument that an agent who acquires his principal’s property or who otherwise acts in a fiduciary capacity must handle the matter as if it were his own business. An agent may not take even the slightest advantage and “... is bound not to act in antagonism, opposition or conflict with the interests of the principal to even the slightest extent.” Id. at 819. There is no question that Melder went beyond the scope of his fiduciary duties to LCI in his attempts to aid Lloyds in selling the salvage but that he acted for Lloyds as a zealous agent should act.
The trial court was impressed with the competence of Melder, but seemed equally unimpressed by the competence of Slaight. As Lloyds’ adjuster, Slaight should have informed LCI of its right to receive immediate payment for the damaged seed. Slaight also had obligations to both Lloyds and LCI, yet he failed to inform LCI of its options and negligently failed to secure payment for LCI at the culmination of his negotiations with Billings. Then, Lloyds and Slaight transferred the salvage operation to LCI, freeing Lloyds from extended paperwork, invoicing and delivery problems which benefited Lloyds. Lloyds now seeks to rely upon Billings’ failure to pay to escape its contractual responsibility to pay LCI for the total value of the fire damaged cottonseed. The written reasons of the trial court particularly noted the inconsistent position of Lloyds as follows:
“Equally strange is the position taken by Insured Lloyds on the ownership of the salvage. On one hand, it says it was not a party to the deal between Billings and Louisiana Cottonseed; but, on the other, it complains that it was not timely advised of Billing’s [sic] nonpayment, and seeks to argue that it would have taken certain steps had it been properly advised. Insured Lloyds simply cannot have it both ways! It cannot be permitted to say ‘Rock our baby for us, but if baby doesn’t go to sleep you’re at fault.’ ”
The failure of Lloyds to pay LCI’s entire claim for the damages from the fire was arbitrary and capricious and its refusal to pay, which was based upon the position that Lloyds was not a party to the contract upon which Billings defaulted, is not supported by the evidence. The finding that Lloyds acted in an arbitrary and capricious manner is a factual one and will not be disturbed in the absence of our finding manifest error.
The amount to be awarded as attorney’s fees where an insurer has been held to be arbitrary and capricious rests largely with the sound discretion of the trial court. Thomas v. Lighthouse Life Ins. Co, 422 So.2d 575 (La.App. 3 Cir.1982). In the case of Artigue v. La. Farm Bureau Mut. Ins. Co., 339 So.2d 880 (La.App. 3 Cir.1976), the court stated factors to be considered in determining the amount of award of attorney’s fees, made pursuant to LSA-R.S. 22:658, against an insurer for arbitrary and *1311 capricious failure to pay a claim within sixty days after satisfactory proof of loss. These factors include the degree of professional skill and ability exercised, the amount of the claim, the amount recovered for the plaintiff, and the time devoted to the case. In the instant case, the trial court noted, “The fees are fixed in this amount [$25,000.00] on the basis that both counsel provided extensive services over a long period of time in a matter of major significance to all the parties and achieved the desired result. Both counsel are senior members of the bar, ‘A’ rated in Martin-dale-Hubbell, experienced in business litigation and their services are much sought after.” There is no reason to disturb the factual finding of the trial court. The award of penalties and attorney’s fees is reasonable and we affirm the decision of the trial court.
For these reasons the judgment of the trial court is affirmed. All costs of this appeal are taxed to defendant-appellant.
AFFIRMED.
STOKER, J., dissents and assigns written reasons.