680 So.2d 1203 (1996)
Philip B. BROWN, Plaintiff-Appellee,
v.
Gayle Q. BROWN, Defendant-Appellant.
No. 28441-CA.
Court of Appeal of Louisiana, Second Circuit.
August 21, 1996.
Rehearing Denied September 19, 1996.
Writ Denied December 6, 1996.
*1205 McLeod Verlander by Robert P. McLeod, David E. Verlander III and Rick W. Duplissey, Monroe, for defendant-appellant.
Kneipp & Hastings by Donald L. Kneipp, Monroe, for plaintiff-Appellee.
Before NORRIS, GASKINS and CARAWAY, JJ.
CARAWAY, Judge.
This appeal by Gayle Q. Brown concerns a trial court judgment partitioning, pursuant to La.R.S. 9:2801, the assets of the former community of appellant and her husband, Philip *1206 Brown, who were divorced in 1981. Mrs. Brown also appeals the trial court's rejection of her shareholder derivative claims against Mr. Brown for his mismanagement and self-dealing regarding the assets of corporations formerly owned by the community. Because the trial court failed to adequately address the implications of the shareholder derivative actions which we find to have merit and because of certain other rulings concerning the valuation and division of the community property, we reverse in part and affirm in part the valuation of the former community property and the judgment of partition.

FACTS
Married in 1957, Philip and Gayle Brown established their matrimonial domicile in East Carroll Parish, Louisiana. Philip began farming in the early 1960's and Gayle worked as a homemaker, rearing the couple's eight children.
In the early 1970's the Browns placed substantially all of their movable assets and cash accounts into Philip Brown Farms, Inc. (PBF), a newly formed corporation, through which Mr. Brown conducted the farming operation and the family's personal business. In 1979, Mr. Brown incorporated Black Gold Farms, Inc. (Black Gold) as a land holding corporation for approximately 1150 acres of farm land and the matrimonial domicile. Mr. and Mrs. Brown were equal shareholders in Black Gold and the above described community property was transferred to the corporation. The Black Gold lands continued to be farmed through Mr. Brown's efforts as president of PBF with the financial matters pertaining to the Black Gold farm transacted through PBF.

Separation 1978-1981
The Browns physically separated sometime in 1978. In January, 1978, Mr. Brown's accountant prepared a financial statement from information furnished by Mr. Brown. The statement reflected the then existing community assets and liabilities, such as the 1150-acre farm and the family residence, along with the corporate assets of PBF. The financial statement also contained one large asset that appears to be Mr. Brown's separate property. After subtracting this asset, the Browns' estate, including the value of assets held in the name of PBF, was shown to total $990,651.95.
Following formation of Black Gold in 1979, Mr. Brown signed another financial statement that he presented to Tallulah Production Credit Association ("TPCA"). This statement reported the Browns' community property, although again no distinction was made between some of the corporate assets of Black Gold and PBF and the personal assets of the Browns. The statement reflects the net worth of the Browns' estate at $1,606,401.24.
At trial, similar financial statements prepared by Mr. Brown's accountant or by Mr. Brown were introduced which reflected the assets and liabilities of the Browns and their family corporations for the years leading up to the 1981 divorce. These financial statements for that critical time period revealed that PBF was a farming entity with its principal assets being farming equipment. The cost of the equipment reflected on these reports was shown to be as high as $500,000, with the actual value, considering depreciation, of the equipment in use in 1981 and 1982 shown at approximately $250,000 to $300,000. Additionally, at that time, PBF was shown to have holdings in cash and other liquid assets in excess of $100,000. Also, reflected on the 1981 statement to TPCA was the value of the current crops being farmed by PBF on the lands of Black Gold and Mr. Brown's family lands discussed below. The crop-in-the-field value in 1981 was listed at $254,744 which coincided with the amount of the crop loan from TPCA which was shown as a current liability on the report.
The 1981 financial reports also showed the Black Gold holdings and certain other assets and liabilities which Mr. Brown certified to TPCA as his personal estate. Black Gold consisted of the 1150-acre farm and the family home together valued at $1,876,500. This property was apparently encumbered to secure loans from the Federal Land Bank and the Prudential Insurance Company totaling approximately $200,000 at the time immediately prior to the divorce. Mr. Brown's "personal" estate also reflected certain other *1207 stock holdings and smaller loans and 80 acres of land in Avoyelles Parish.
While separated from Mrs. Brown, Mr. Brown engaged in a number of cash transactions that he was unable to explain at trial. Mr. Brown purchased $175,389.82 worth of cashier's checks that listed Philip B. Brown as both the remitter and payee. When questioned concerning the purpose of these checks and the origin of the funds used to purchase them, Mr. Brown could offer no explanation.
On a 1978 financial statement Mr. Brown listed $71,051.56 in stocks and bonds. By 1979 the list of stocks and bonds had grown to $124,126 but one year later the amount had fallen to $56,537.47. In 1981 Mr. Brown listed stocks in the amount of $54,992 but one year later he only claimed $20,000 in stocks. Mr. Brown provided no explanation for this fluctuation in the family's stock and bond holdings and could not recall what happened to the assets.

Post Divorce Events
Following the Browns' 1981 divorce, Mrs. Brown continued living in the family home, owned by Black Gold, and continued as the homemaker and primary care giver for the couple's remaining minor children. Mrs. Brown apparently was not employed outside the home and did not participate in managing the family corporations. Mr. Brown maintained his role as managing officer of the family owned corporations. Additionally, Mr. Brown continued to control virtually all of the finances pertaining to Mrs. Brown and the children. The mortgage on the house, utilities, insurance and the children's private school tuition were for the most part paid directly by Mr. Brown with Mrs. Brown informing him of the need to remit payment for most of the expenses. Mr. Brown exercised total control of the prior community corporations from the time of the 1981 divorce until the 1994 trial to partition the former community.
Prior to the Browns' 1981 divorce, PBF had farmed, pursuant to a sharecropping agreement, a significant amount of land belonging to Panola, Inc. (Panola), a farm originally owned by Mr. Brown's parents and later, following the death of Philip's father, owned by Philip's mother and Philip and his siblings. The sharecropping arrangement continued after the divorce, but by 1983, Mr. Brown had formed a new corporation, East Panola ("EP"), to begin farming his family land. Following his mother's death in 1984, Mr. Brown inherited a specific portion of the Panola farm acreage which he farmed as EP lands.
Bruce Betts was the accountant for Mr. Brown from 1984 until the time of trial. Betts performed accounting services for Mr. Brown, EP, and for the various corporations owned by the Browns. Betts' testimony at trial reveals Mr. Brown indiscriminately used PBF's money, equipment, and employees to farm not only the Black Gold acreage but also the farm lands of Panola and EP without keeping adequate records and reimbursing PBF in an accurate manner. Mrs. Brown produced numerous bills for farming supplies on which Mr. Brown had written: "pay ½ PBF ½ EP." However neither Mr. Brown nor his accountant could verify that the supplies were equally allocated. For example, EP farmed significantly more cotton than PBF; however, the supplies for cotton farming were allocated one-half to EP and one-half to PBF. Mr. Brown also admitted he instructed PBF employees to work on the EP farm without keeping adequate records.
The evidence revealed that PBF paid Mr. Brown's monthly $900 child support obligation which had been ordered by the court in the 1981 divorce proceedings. The community corporation bore no responsibility for Mr. Brown's support obligation which was a separate debt, and Betts admitted the charges, to the extent that they were accounted for through the corporation, should have at least been assessed against Mr. Brown's percentage of PBF's profits. Instead of using his share of the profits to satisfy the obligation, Mr. Brown instructed the accountants to pay the support obligation from the income or assets of PBF and to charge the payments against Mrs. Brown's portion of the corporate profits.
Betts, testifying from financial records, admitted Philip Brown and his separate corporation, EP, owed PBF $306,900 in rent for *1208 the equipment used in the EP farming operation. Mr. Brown used the PBF equipment to farm his separate farmland and then deducted the "rental payments" on tax returns for his separate corporations. The amount chosen for the yearly equipment rental was set by Mr. Brown. Both Brown and Betts admitted that most of this money was never paid to PBF but was allowed to grow over time as an unpaid accounts receivable owed by EP to PBF. Mr. Brown testified he repaid PBF "in-kind" by working on its farm (apparently the Black Gold farmland) and loaning the community corporation his personal farm equipment. Betts attempted to explain how part of the rentals was repaid by EP paying off debts of PBF, yet such explanations were not supported by documentation. Betts also testified that on other occasions, PBF would borrow money and the proceeds of the loan were deposited into an EP account.
In giving his testimony, Betts relied primarily on "reconstructed records," the originals of which were not produced, and could only adequately explain a handful of transactions. For the critical years of 1981-83 when another accountant was employed by Mr. Brown, no specific accounting data for PBF, such as ledgers or check registers, were introduced at trial. An audit of PBF's affairs for the years subsequent to 1981 was therefore impossible to perform based upon the poor state of its financial records. The evidence at trial revealed nevertheless a pattern of activity by Mr. Brown in commingling the corporations' accounts that resulted in the financial ruin of PBF.
As time passed, Mr. Brown's farming operations on Black Gold lands became less productive and dwindled. By 1986, the total taxable income of EP shown on its federal tax return was seven times greater than Black Gold's taxable income, and by 1988 it was almost ten times greater. Mr. Brown testified that PBF experienced crop loan carryover losses from approximately 1986-1988 because his farming efforts on the Black Gold acreage were not producing sufficient crops to pay off each year's crop loans. At trial, Ed Dauphin, the president of Louisiana Delta Bank, and Mr. Brown testified that the 1150-acre farm owned by Black Gold was leased for farming for $75,000 a year sometime in the late 1980's. Though the propriety of this farming lease of the Black Gold acreage was disputed by Mrs. Brown, Mr. Brown strenuously asserted that $75,000 a year was a fair farm rental for the 1150 acres and was far more than what had been realized from his farming of the acreage in the prior years.
By the late 1980's, PBF became basically inactive as a farming entity. In 1985, Mr. Brown had conveyed a significant portion of PBF's farming equipment to EP allegedly for $65,000 in a transaction which was disputed at trial by Mrs. Brown. The remaining equipment was put to little use. At the end of the 1986 farming season, PBF's loans for farming operations obtained from TPCA totaled $363,254. The loans were described on PBF's 1986 financial statement as "advances maturing within one year" which were "secured by crop liens and equipment." On PBF's 1987 financial statement, the TPCA loan was replaced with a new debt with Louisiana Delta Bank totaling $369,565 which was reported to be secured in part ($271,565) "by real estate owned by a related entity." Thus, the 1987 borrowings for crop expenditures had apparently dropped significantly and the crop loan carryover losses of the prior years required that real estate mortgages be placed on the Black Gold acreage. Mr. Brown conducted his farming activities as time passed almost exclusively in connection with his separate corporation, EP. By the time of trial, a December 31, 1992 financial statement for PBF prepared by Betts showed PBF's remaining primary asset to be a $246,757 account receivable owed by EP. The list of liabilities of PBF revealed $362,267 owed to Louisiana Delta Bank and an unexplained $113,387 debt owed to Black Gold.
By the time of trial in 1994, Mr. Dauphin stated that all the former debt of Black Gold (which on Black Gold's 1992 financial statement was last shown to be $120,000) and the debts of PBF had been consolidated into a $498,000 loan owed by PBF. This loan was secured by the personal guaranty of Mr. Brown, by mortgages on the Black Gold *1209 properties, and by a pledge of the $75,000 per year rent generated by the Black Gold farm acreage.

TRIAL COURT PROCEEDINGS
Although the Browns divorced in 1981, neither spouse filed suit to partition the community property until August, 1991. Mr. Brown sued for partition and Mrs. Brown filed a reconventional demand that included a derivative suit asserting that Mr. Brown, as corporate officer, had mismanaged the assets of PBF and Black Gold for his personal benefit. Mrs. Brown also asserted that all assets held by Mr. Brown in 1994 be considered a part of one mass amounting to the former community.
Following a lengthy trial in which the parties introduced volumes of exhibits and accounting data, the trial court valued the former community property as of the time of trial and divided the property approximately equally between the Browns.[1] The court ruled:
"Gayle Brown produced and was allowed to file into evidence numerous examples of financial transactions by Philip Brown from a time before the termination of the community until the time of trial. These were ostensibly designed to prove a grand scheme of Philip Brown to defraud Gayle Brown of her interest in community property. After a careful review of the evidence and trial testimony in light of LSA-C.C. article 2369 this Court finds that Gayle Brown has failed to establish a prima facie case that Philip Brown has violated his obligation to act as a prudent administrator with respect to community property...."
While choosing to emphasize and apply the prudent administrator standard imposed upon a co-owner who undertakes the management of co-owned property, the trial court's ruling did not explain why the greater fiduciary standard imposed upon an officer of a corporation under La.R.S. 12:91 was inapplicable.
In partitioning the ownership of the two primary corporations of the Browns, the trial court apparently attempted to give the ownership of PBF solely to Mr. Brown and the ownership of Black Gold to Mrs. Brown. In other words, the former community shareholdings of Mrs. Brown in PBF were conveyed to Mr. Brown in exchange for his shares in Black Gold. The value of PBF credited by the trial court to Mr. Brown as a portion of his share of the former community assets was listed at $205,952 which represented the balance of PBF's only asset, the account receivable owed by EP to PBF. Mrs. Brown was credited with the value of the Black Gold assets, $140,000 for the family home and $974,950 for the 1150-acre farm.
A significant problem with the trial court's allocation of each separate corporation to each spouse concerns, however, the very different allocation the court attempted to make with the $498,000 debt owed to the Louisiana Delta Bank. The judgment of the court mischaracterized this amount as "the debt of the community regime formerly existing between the parties." This loan, which arose well after the termination of the community, was the indebtedness of PBF whose stock ownership was conveyed to Mr. Brown. Nevertheless, Mrs. Brown was allocated this debt along with her acquisition of the ownership of Black Gold. Though the parties' stock ownership in PBF was the asset to be distributed in the partition, the corporation was in essence liquidated by the trial court with its assets going to Mr. Brown and its liabilities going to Mrs. Brown.
In making this partition, the court rejected the assertion by Mrs. Brown that the investment accounts and other holdings of Mr. Brown which were acquired by him after the divorce and which had values totaling over $1.6 million at the time of trial should be considered as a part of the community property. The court valued and awarded all of the Browns' stock ownership in two local companies, Gailliard Gin, Inc. (the "Gin stock") and FNB Bancshares (the "FNB stock"), to Mr. Brown over the objection of Mrs. Brown. Finally, the court rejected all of Mrs. Brown's demands regarding reimbursement of the community for the disputed *1210 cash transactions discussed above which occurred prior to the divorce.

ASSIGNMENTS OF ERROR
Appellant, Mrs. Brown, assigned ten specifications of error, which we consolidate and summarize as follows:
(i) The court erred by failing to place the burden of proof upon Philip Brown, as a fiduciary, to explain and account for the assets of the community, before and after the termination of the marriage, and the assets of the corporations under his control.
(ii) The court erred in its valuation of PBF and Black Gold by failing to address the consequences of Philip Brown's breach of his fiduciary duty as the managing officer of the corporations whereby the corporations suffered the deterioration or disappearance of the property in his care and control.
(iii) The trial court erred by failing to include, as part of the community to be valued and partitioned, the value of numerous assets which were acquired by Philip Brown after the termination of the marriage.
(iv) The trial court erred by failing to divide the Gin stock and the FNB stock in kind.
Appellee, Mr. Brown, attempts to raise on appeal the issue of the three-year prescription set forth under La.C.C. art. 2369 which the trial court rejected. While we find that the trial court's rejection of Mr. Brown's exception of such prescription was proper, Mr. Brown did not answer the appeal nor appeal himself so as to properly present this on appeal. La.C.C.P. art. 2133. Also, during oral argument and in a supplemental brief filed thereafter, Mr. Brown asserted, for the first time, the prescription of one-year and ten-years to the claims of Mrs. Brown. Though we likewise are not required to consider this plea of prescription which was not presented through a properly filed peremptory exception pursuant to La.C.C.P. art. 2163, we point out that this suit was filed within ten years of the termination of the marriage so that the fiduciary obligations which serve as the basis for Mrs. Brown's claims have not prescribed. Mary v. Lupin Foundation, 609 So.2d 184 (La.1992) and La.C.C. art. 3469.

LAW
The claims against Mr. Brown raised by appellant involve his actions before and after the 1981 dissolution of the marriage and his actions as a spouse or as a corporate officer of PBF and Black Gold. His actions during the marriage also occurred before and after the revision of Louisiana's matrimonial regimes law which became effective on January 1, 1980. 1979 La.Acts. No. 709.
Prior to the enactment of the 1980 revision that provided for equal management of community property, the husband possessed the exclusive right to manage, sell, alienate, or encumber community property during the existence of the marriage. Speights v. Nance, 142 So.2d 418 (La.App. 2d Cir.1962). Former La.C.C. art. 2404 provided:
The husband is the head and master of the partnership or community of gains; he administers its effects, disposes of the revenues which they produce, and may alienate them by an onerous title, without the consent and permission of his wife.
In Pitre v. Pitre, 172 So.2d 693 (La.1965), the court held:
Since under the Louisiana community property system the husband during the marriage has the management and control of the community property, one-half of which belongs to the wife, he as the managing partner is in a position to know relevant facts concerning this property which his wife does not know. Thus when the marriage is dissolved and the community property is to be partitioned, he stands in a fiduciary relationship towards his wife and owes to her the duty of full disclosure of the community property and its value, and must not conceal or misrepresent any material fact upon which she has a right to rely and upon which she might rely. (Emphasis added.)
In a subsequent decision that relied heavily on the Pitre rationale, this court held that a husband stands in a fiduciary relationship to his wife and is bound to disclose to her all of the community property belonging to them and its evaluation. Hodson v. Hodson, 292 So.2d 831 (La.App. 2d Cir.1974). Because *1211 Mr. Hodson either failed or refused to account for numerous cash transactions, this court required him to reimburse his former wife for her portion of the community assets. [Cf., Blalock v. Blalock, 259 So.2d 367 (La. App. 2d Cir.1972), where the former wife was held accountable in a partition action for her failure to explain or account for the disposition of funds from a savings account standing in her name.]
After 1980, under the equal management regime, either spouse may dispose of the community property, such as cash or cash accounts, so long as no loss or damage is caused by fraud or bad faith. La.C.C. arts. 2346 and 2354. Either spouse who undertakes actions with the community assets and who appears to abuse the management role through unusual transactions indicating self-dealing owes a duty of full disclosure to clarify that no fraud or bad faith has occurred.
Officers and directors of a corporation are deemed to stand in a fiduciary relationship to the corporation and its shareholders and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment and skill which ordinarily prudent men would exercise under similar circumstances in like positions. La. R.S. 12:91. The Louisiana Supreme Court discussed the fiduciary duty in Noe v. Roussel, 310 So.2d 806 (La.1975):
[A]n agent who acquires his principal's property, or one who otherwise acts in a fiduciary capacity, bears the burden of establishing that the transaction was an arm's length affair. This means that the agent or fiduciary must handle the matter as though it were his own affair. It also means the agent or fiduciary may not take even the slightest advantage, but must zealously, diligently and honestly guard and champion the rights of his principal against all other persons whomsoever, and is bound not to act in antagonism, opposition or conflict with the interest of the principal to even the slightest extent. The reason for the rule is obvious.
When the corporation refuses to enforce a right which it may enforce, such as a suit for breach of fiduciary duty, a shareholder may file suit and join the corporation as a defendant with the obligor against whom the obligation is sought to be enforced. The plaintiff shareholder must include a prayer for judgment in favor of the corporation and against the obligor on the obligation sought to be enforced. La.C.C.P. arts. 596 and 611. The person acting in the fiduciary capacity bears the burden of establishing that his transactions were legitimate. Donaldson v. Universal Engineering of Maplewood Inc., 606 So.2d 980 (La.App. 3d Cir.1992). If the courts determine that a director or officer has breached his fiduciary duties to the corporation and its shareholders then the officer will be liable to the corporation for damages caused by the breach.

DISCUSSION
The trial court's ruling did not address the implications of the numerous transactions before and after the divorce where Mr. Brown's management of community assets or the assets of PBF or Black Gold demonstrated self-dealing or less than arm's length transactions with Mr. Brown's separate corporations. The jurisprudence has sometimes characterized such transactions as carrying fraud on their face or as badges of fraud. Cuggy v. Zeller, 132 La. 222, 61 So. 209 (1913). Since we hold that Mr. Brown was a fiduciary in his roles as husband and corporate officer prior to the divorce and as corporate officer after the divorce, he was under a duty to explain and remove those badges of fraud and demonstrate that his management of the community and the family corporations was in good faith. Noe v. Roussel, supra.

Cash Transactions
There were several transactions during the time of the Browns' separation prior to the 1981 divorce where large amounts of money in the form of cashier's checks were made payable to Mr. Brown. The remitter on each of these checks was listed also as Mr. Brown. The checks occurred as follows:
Check #23650 dated May 30, 1978 for $49,854.84
Check # 27269 dated October 12, 1979 for *1212 $95,684.09
Check # 29594 dated November 25, 1980 for $7,462.50
Check # 29592 dated November 25, 1980 for $7,462.50
Check # 29590 dated November 25, 1980 for $7,462.50
Check # 29591 dated November 25, 1980 for $7,462.50
The two largest checks were later deposited in banks other than the bank where Mr. Brown through PBF had routinely conducted the affairs of the farming business. The disposition of the other checks was unclear from Mr. Brown's testimony.
Mr. Brown testified that at the time of these transactions his farming business and the family's personal finances were transacted through the accounts of PBF. He could not explain how these checks payable to himself were employed for the benefit of the community. These monies were presumed community property or otherwise the corporate funds of PBF. On the financial statements of PBF and/or Mr. Brown which were introduced at trial for the years in question these funds were not indicated. No specific records from the banks where these checks were cashed were produced by Mr. Brown to explain how these monies remained within the community or the corporation. Since these unusually large withdrawals of funds during the estrangement of the parties prior to divorce required an explanation and accounting from Mr. Brown, we hold that he is liable for the return of $175,390 to the community.
There were other large cashier's checks issued prior to the divorce which were contested by Mrs. Brown. However, these checks were made payable to persons other than Philip Brown and therefore do not indicate self-dealing on the part of Mr. Brown which would impose upon him the rigorous burden to explain and account. The evidence presented by Mrs. Brown regarding these transactions was insufficient to demonstrate that Mr. Brown's actions were detrimental to the community or PBF. Likewise, the unexplained fluctuation in the stock holdings discussion above for the years preceding the divorce which were reported on the yearly financial statements do not demonstrate from the face of those records that Mr. Brown sold the stock to place the proceeds outside of the regular PBF accounts through which he conducted the farming business and his family's personal transactions.

Black Gold and PBF Derivative Actions
At the termination of their marriage, the primary assets comprising the Browns' community property were their stock holdings in PBF and Black Gold which had been managed by Mr. Brown. Mr. Brown was under no duty to continue as the corporate manager and could have resigned leaving the shareholders, he and Mrs. Brown, to decide to continue the operations of the corporations or to liquidate the corporations. He chose, however, to continue to manage the two farming entities and with such choice, he owed the fiduciary duty of La.R.S. 12:91 to manage without taking the slightest advantage of the corporations or to act in conflict with his interests in the other farming entities which he separately owned.
As a shareholder in PBF and Black Gold, Mrs. Brown joined with this suit to partition the former community property separate shareholder derivative actions. She named the corporations as parties to the actions and prayed for judgment in favor of the corporations for the damages caused by Mr. Brown's breach of his fiduciary duties.
The evidence as summarized above demonstrated constant interaction between the community corporations, PBF and Black Gold, and EP and certain other separate farming endeavors owned by Mr. Brown. Mr. Betts downplayed the lack of strict accounting practices between these entities because they were "related" entities in his opinion. This was not the case at all. While EP and certain other farming ventures were wholly owned by Mr. Brown, the stock ownership of PBF and Black Gold was jointly owned by two shareholders who were no longer married and who could be expected to require a strict accounting and ultimate liquidation and partition of the former community corporations and other assets.
*1213 As manager of the corporations, a conflict of interest was grossly present with Mr. Brown's use of inventory, labor, equipment and credit of PBF in jointly farming the Black Gold acreage and the Panola/EP acreage. The record does not reveal which crops on which land made a profit in any given year based upon a separate and accurate allocation of the farming costs of seed, fertilizer, equipment rent, and interest expense on the loans from TPCA. PBF's large inventory of farming equipment was applied in this unaccounted endeavor and over time the equipment was used up in the process or "sold" off to EP or traded-in on new equipment purchased in the name of EP. While the evidence indicated that Black Gold's 1150-acre farm may not have been as fertile and profitable as EP's acreage which Mr. Brown jointly farmed through PBF, no accurate comparison of the performance of the two corporations was or could be made. The first clearly identifiable revenue figure attributable solely to Black Gold appears only after Mr. Brown decided that a lease of the farm for $75,000 would be more profitable.
The fiduciary duty of the corporate officer requires that these joint dealings with EP, badges of fraud, be put to a rigorous scrutiny and that the burden of establishing the complete fairness of these transactions was upon Mr. Brown. Noe v. Roussel, supra. The trial court erroneously placed the burden of proof upon Mrs. Brown and awarded no judgment in favor of the corporations in the derivative actions. We find that the poor and undetailed accounting presented by Mr. Brown does not stand the test required of him as a fiduciary so that he breached his duties to PBF and Black Gold.

Measure of Damages
In determining the damages suffered by PBF and Black Gold, we first determine the financial status of the corporations at the time prior to the commingling of their corporate matters with EP. This time roughly coincides with the time of the dissolution of the marriage in 1981.
Between 1977 and 1982, the inventory of PBF's primary assets, its farming equipment, increased at least $200,000 to a cost value (excluding depreciation) of over $500,000 as reflected on the yearly balance sheet statements. An appraisal of this equipment prepared by TPCA in early 1982 reflected a value of $307,000. This figure compares to a net value (cost less depreciation) of the equipment of $232,000 listed on PBF's balance sheet for the peak year of 1981. In 1981 and 1982, PBF's holdings in certificates of deposit and other liquid assets totaled approximately $140,000. On the liability side of the ledger, PBF had a sizeable current liability for its loans for the crops-in-the-field on the Black Gold and Panola acreage. Since that liability was offset by the value of the crops, the only liability shown on PBF's financial statement with a longer term nature was an $80,000 TPCA loan apparently pertaining to the financing of some of the equipment.
Based upon a thorough review of the assets and liabilities of PBF, we find that as the marriage ended and prior to the time of EP, PBF had a net worth of $350,000 in 1981-1982. The trial court determined that at the time of trial in 1994, PBF's only asset was worth $205,952. The evidence also reflected that PBF's debt in 1994 was $498,000 resulting in PBF having a negative net worth of $292,048. Because of this loss in the value of PBF between 1982 and 1994 which went unexplained by Mr. Brown in the midst of the dealings with his personal entities, we find that Mr. Brown owes PBF $642,048 in damages for the breach of his fiduciary duties which will return the net worth of PBF to its 1981-82 value of $350,000.
The primary value of Black Gold has remained constant through the years because of its ownership of the 1150-acre farm and the residence occupied by Mrs. Brown and the Brown children. In 1979, the mortgage debt on this property was $215,000, consisting of loans from the Federal Land Bank and Prudential Insurance Company. By 1992, only the loan from Prudential with a balance of $120,000 remained. That debt was then consolidated with the farming debt of PBF.
The detriment which Black Gold suffered under the management of Mr. Brown concerns the rental value of the 1150-acre farm. Mr. Brown finally leased the farm by 1990 *1214 for an annual rental of $75,000. This annual income was then applied to repay PBF's loans with Louisiana Delta Bank. From 1982 until 1990, any profits from the farm were absorbed into PBF and never clearly delineated as attributable to Black Gold's crops. Since Mr. Brown's separate labor was a contributing factor in the farming of the Black Gold acreage and since Mrs. Brown resided in the home owned by Black Gold, we do not award a rental amount for each year between 1982 and 1990. However, based upon evidence on the PBF financial statement for 1992 showing a liability owed to Black Gold and upon the rental income that certainly could have been earned by Black Gold in the later years of the 1980's, we hold that the former Prudential Insurance Company debt, now consolidated with the loans of PBF, is no longer a liability of Black Gold for purposes of the value placed upon the corporation for this partition.
Based upon the above analysis of Black Gold, we hold that Mr. Brown is liable to the corporation in the amount of $300,000 for breach of his fiduciary obligation concerning the farm rentals for the years 1990 through 1994 and is additionally liable for the amount of any rentals from the Black Gold acreage applied to the loan of PBF subsequent to the time of the trial. We also hold that Mr. Brown has damaged the corporation by encumbering its assets with mortgages to secure the debt of PBF (such debt, itself, a measure of Mr. Brown's delinquency as the fiduciary of PBF). We hold, therefore, that Mr. Brown is obligated to indemnify Black Gold for any loss which may be sustained as the result of the non-payment of PBF's loan ($498,000 at trial) for which the Black Gold property has been mortgaged and is further obligated to remove the mortgage against Black Gold's property within six months following the finality of this judgment. Based upon the appraised values for the Black Gold property determined by the trial court, we find that the value of Black Gold, including the $300,000 judgment debt of Mr. Brown, is $1,414,950.
Mrs. Brown argues that the measure of the loss caused by the commingled operations of PBF and Black Gold with Mr. Brown's other corporations should be made by considering the value of certain investment accounts owned by Mr. Brown. Citing the case of Queenan v. Queenan, 492 So.2d 902 (La.App. 3rd Cir.1986), writ denied, 496 So.2d 1045 (La.1986), Mrs. Brown argues that Mr. Brown's separate investment accounts, which increased greatly as the assets and profits of PBF and Black Gold disappeared, should be treated as part of the mass of assets comprising the former community and the family corporations.
In Queenan, the former husband set up a new corporation following the divorce which he then operated out of the same office along with the former community business. By comparing the book values of the two corporations, the court easily saw that the new corporation flourished at the expense of the family-owned corporation and therefore ruled that the second corporation, though technically the separate property of the husband, would be considered as part of the community property subject to the parties' partition.
The ease of the association and comparison which existed between the two corporations in Queenan and which allowed for the unique remedy fashioned by that court is not present in this case. In this case, the second corporation, EP, which presumably bled off the assets and profits of PBF and Black Gold, is a farming venture established upon the inherited lands of Mr. Brown. Its essential asset, its land, establishes a separate identity from the former community corporations, and indeed, Mrs. Brown does not argue that EP should be considered as part of the former community. Mr. Brown's separate investment accounts bear no direct relation with the activities of PBF and Black Gold, and Mrs. Brown's position that all of the value of those accounts resulted from the pillage of the community corporations was not proven. We decline to apply the Queenan assessment and evaluation for the damage caused by Mr. Brown's commingled business activities in this case.

Gin Stock and FNB Stock
Mrs. Brown next asserts that the trial court erred in awarding Mr. Brown all of the Gailliard Gin stock instead of dividing it in *1215 kind. The evidence revealed that the Gin was a closely held local corporation organized by Mr. Brown and other cotton farmers to service their farming needs. The stock was obviously not traded on a large public stock exchange so as to provide a readily accessible market value. At the time of trial the Gin was involved in litigation as a plaintiff which, if successful, would significantly increase the value of the stock. Although Mr. Brown's status as a cotton farmer was no doubt a factor in the trial court's grant of the stock to Mr. Brown, the equal division of the stock in kind would still maintain Mr. Brown's relationship with the corporation as a shareholder. The trial court, ruled that the pending outcome of the Gin's litigation was not an appropriate factor to consider in the valuation which he then determined from prior sales of the Gin stock to be $800 per share.
While recognizing the broad discretion of the trial court to divide the community property, we find that under the facts of this case when a community asset is easily divisible in kind, when the entire allocation of the assets to one spouse is not warranted under La.R.S. 9:2801(4)(c) for special circumstances, and when there is evidence that a significant increase or decrease in the value of the asset is imminent, the trial court should attempt to divide the asset in kind to avoid the disputed issue of valuation. However, we recognize that under the process set forth in La.R.S. 9:2801(4), whereby the court is charged to divide the property "so that each spouse receives property of an equal net value" and so as to minimize, if possible, the need for payment of an "equalizing sum of money" by one spouse, the partition of assets such as the Gin stock, which are readily divisible in kind, cannot always be made. Nevertheless, since our ruling regarding the valuation of PBF and Black Gold requires us to significantly amend the partition, we are now able to allocate the Gin stock equally to the parties through the amended division of the overall community set forth below.
The Browns also owned 123 shares of the FNB stock that the trial court valued at $240.00 per share. In partitioning the property, the trial court awarded all 123 shares of the stock, a $29,520 value, to Mr. Brown. Subsequent to the rendition of judgment but within the new trial delays set forth in the Code of Civil Procedure, FNB Bancshares publicly announced its plans to merge with Hibernia National Bank resulting in the potential for a dramatic increase in the value of the FNB stock. Mrs. Brown timely filed a motion for new trial asserting the dramatic increase in the value of the FNB stock resulted in an unjust division of the former community.
The evidence at the hearing on the motion for new trial revealed that the proposed merger, which remained subject to regulatory approval at the time of the hearing, would result in FNB shareholders being awarded 92 shares of Hibernia Bank stock for each share of FNB; therefore, Mr. Brown would own as a result of the judgment, 11,316 shares of Hibernia Bank stock. The testimony indicated that the regulatory approval and other actions necessary to consummate the merger were very likely to occur. On the day of the announcement Hibernia stock was publicly trading for $8.63 and on the day of the hearing the stock was trading for $10.50 a share. Accordingly, at the date of the hearing on the motion for new trial the potential value had increased to $118,818.
After allowing the testimony regarding the merger and having expressed his opinion that a dramatic increase in the value of the FNB stock was likely, the trial court, nevertheless, felt compelled by the language of La. 9:2801(4)(a) to retain his original valuation of the stock based upon the testimony presented "as of the time of trial on the merits." Recognizing that in his initial judgment the allocation to Mr. Brown of the entirety of the $29,520 value of the stock had caused Mr. Brown's share of the divided community to be $28,969 more than Mrs. Brown and had necessitated a $14,534 equalizing cash payment to Mrs. Brown (see Appendix A), the trial court expressed regret that he had not divided the stock in kind in rendering his judgment. Nevertheless, the trial court refused to make an adjustment to his prior judgment through the new trial proceedings.
We do not read the quoted language of La. 9:2801(4)(a) regarding valuation at the time of trial on the merits so narrowly as to *1216 abrogate potential proceedings for a new trial. When all of these statutes are read together in situations where an error of law [La.C.C.P. art. 1972(1)] or newly discovered evidence [La.C.C.P. art. 1972(2)] is revealed, the proceeding at the new trial stage occurring immediately after the rendition of the initial partition judgment is an extension of the "trial on the merits" which may necessitate a re-valuation of an asset. After wrestling with the valuation and division of this multi-asset estate, we recognize the trial court's concern that ongoing contentions regarding the effects of subsequent economic changes to the value of the assets might, through new trial proceedings, extend the partition process indefinitely. However, in this case, with the dramatic increase in the value of this stock and the unnecessary equalizing cash payment ordered in the initial judgment, the trial court's failure to have divided this stock in kind was error.

Amended Partition
While we affirm most of the valuations given by the trial court to the assets comprising the former community, we amend the partition by making the changes to the values for PBF and Black Gold based upon the derivative action claims against Mr. Brown and by returning the value of the unexplained cashier's checks. The amended partition which we now order is set forth in Appendix B.
The trial court awarded the Black Gold properties to Mrs. Brown based upon his finding that Mrs. Brown had continued to reside in the former matrimonial domicil owned by this corporation. We affirm the award of this corporation to Mrs. Brown. The value of the corporation now includes the $300,000 judgment awarded herein against Mr. Brown for the breach of his fiduciary duties. To equalize the award of this corporation to Mrs. Brown as her share of the former community, Mrs. Brown is also assessed an equalizing payment of $279,557 to Mr. Brown. This large amount, however, is offset by the $300,000 judgment in favor of Mrs. Brown's solely owned corporation.

CONCLUSION
The amended partition judgment of this court of the community property recognizing the new valuations for Black Gold and PBF is set forth in Appendix B. For the breach of his fiduciary duty to PBF, it is ordered, adjudged, and decreed that judgment is rendered in favor of PBF and against Mr. Brown for the sum of $642,048. For the breach of his fiduciary duty to Black Gold, it is further ordered, adjudged, and decreed (i) that judgment is rendered in favor of Black Gold and against Mr. Brown for $300,000; (ii) that judgment is rendered in favor of Black Gold and against Mr. Brown for the amount of any rental earned in connection with the lease of the 1150 acres for the years 1995 and following; (iii) that Mr. Brown is ordered to indemnify Black Gold for any loss which may result from the encumbrances of Black Gold's property to secure the loans of PBF; and (iv) that Mr. Brown is ordered to remove such encumbrances of Black Gold's property within six months of the finality of this judgment.
The costs of appeal are assessed to the appellee, Mr. Brown.
REVERSED IN PART; AFFIRMED IN PART.

APPLICATION FOR REHEARING
Before MARVIN, NORRIS, HIGHTOWER, GASKINS and CARAWAY, JJ.
Rehearing denied.

 Appendix A
 ALLOCATION OF ASSETS AND LIABILITIES
TO GAYLE Q. BROWN VALUE
1. Black Gold Farms, Inc.
 A. Residence (Lake Street) $140,000.00
 B. Brodie Farm (1150 acres) $974,950.00

*1217
 C. Less Mortgage Indebtedness at Time of Trial [498,000.00]
 ____________
 Total Corporate Net Worth $616,950.00
2. Lake Providence Country Club Stock 100.00
 ___________
NET VALUE $617,050.00
EQUITY PAYMENT FROM MR. BROWN $ 14,484.64
 ___________
 $631,534.64
 ===========
TO PHILIP B. BROWN
1. Philip Brown Farms, Inc. stock $205,952.00
2. Dreyfuss Fund $ 9,279.81
3. Fidelity Trend Fund $ 87,267.46
4. Buckshot, Inc. stock $ 52,000.00
5. Gailliard Gin, Inc. $ 80,000.00
6. Gailliard Gin, Inc. dividends $105,000.00
7. Hopewell Plantation, Inc. $ 27,000.00
8. FNB Bancshares (123 shares at $240.00) $ 29,520.00
9. Household furniture, fixtures and movables $ 50,000.00
NET VALUE $646,019.27
EQUALIZING PAYMENT TO MRS. BROWN [ 14,484.64]
 ____________
 $631,534.63
 ===========
 ITEMS DIVIDED IN KIND
 To Gayle Q. Brown To Philip B. Brown
MAPCO 256 ½ shares 256 ½ shares
Mississippi Chemical Co. 243 ½ shares 243 ½ shares
Farm Bureau IRA $5,557.23 plus interest $5,557.23 plus interest
East Carroll Parish
Police Jury ½ of cash value at ½ of cash value at
Insurance Policy termination of community termination of community
 Appendix B
 AMENDED ALLOCATION OF ASSETS
TO GAYLE Q. BROWN VALUE
1. Black Gold Farms, Inc.
 A. Residence (Lake Street) $140,000.00
 B. Brodie Farm (1150 acres) $974,950.00
 C. Philip Brown Debt $300,000.00
 ___________
 Total Corporate Net Worth $1,414,950.00
2. Lake Providence Country Club Stock 100.00
 _____________
NET VALUE $1,415,050,00
EQUALIZING PAYMENT TO MR. BROWN [ 279,557.00]
 ______________
 $1,135,493.00
 ==============
TO PHILIP B. BROWN
1. Philip Brown Farms, Inc.
 A. Accts Receivable (East Panola) $205,952.00
 B. Philip Brown Debt $642,048.00
 C. Less Liability to Louisiana Delta Bank [498,000.00]
 ____________
 Total Corporate Net Worth $ 350,000.00
2. Dreyfuss Fund $ 9,279.81
3. Fidelity Trend Fund $ 87,267.46
4. Buckshot, Inc. stock $ 52,000.00
5. Gailliard Gin, Inc. dividends $ 105,000.00

*1218
6. Hopewell Plantation, Inc. $ 27,000.00
7. Household furniture, fixtures and movables $ 50,000.00
8. Cashier's Checks to Philip Brown $ 175,390.00
 ------------
NET VALUE $ 855,937.27
EQUALIZING PAYMENT FROM MRS. BROWN $ 279,557.00
 _____________
 $1,135,494.27
 =============
 ITEMS DIVIDED IN KIND
 To Gayle Q. Brown To Philip B. Brown
MAPCO 256 ½ shares 256 ½ shares
Mississippi Chemical Co. 243 ½ shares 243 ½ shares
Farm Bureau IRA $5,557.23 plus interest $5,557.23 plus interest
East Carroll Parish
Police Jury ½ of cash value at ½ of cash value at
Insurance Policy termination of community termination of community
Gailliard Gin, Inc. 50 shares 50 shares
FNB Bancshares 61½ shares 61½ shares

NOTES
[1] See the court's allocation set forth in APPENDIX "A" to this opinion.